1-99-1809 FIFTH DIVISION

JUNE 30, 2000

INDECK NORTH AMERICAN POWER FUND, L.P.,   ) 

INDECK AUBURNDALE, L.L.C., and INDECK,    ) Appeal from the 

GORDONSVILLE, L.L.C., ) Circuit Court of

) Cook County.

Plaintiffs-Appellants, )

)

v. ) 

)  

NORWEB plc, NORWEB POWER SERVICES         )

(No 1) LIMITED, NORTHERN HYDRO LIMITED,   )

CALPINE AUBURNDALE, INC., and CALPINE     ) Honorable

GORDONSVILLE, INC., ) Sheldon Gardner, 

) Judge Presiding.

Defendants-Appellees. )                

JUSTICE HARTMAN delivered the opinion of the court: 

This case involves two purchase and sale agreements and pre-existing partnership agreements through which various partnerships, which owned and operated electric generating power plants, intended to convey their interests to other partnerships wishing to purchase them.  Pre-existing partnership rights (
i.e.
, first refusal, denial of permission to sell, and designated other purchaser), owned by another entity not involved in the purchase and sale were exercised by that entity prior to the closing of the purchases, thereby preventing the subject sale.  Instead, the sales of the plants were made to a purchaser designated by the non-contracting partner.

The putative purchasers under the purchase and sale agreement, plaintiffs Indeck North American Power Fund, L.P., Indeck Auburndale, L.L.C., and Indeck Gordonsville, L.L.C. (collectively "Indeck(s)"), appeal from the order of the circuit court granting summary judgment in favor of the putative sellers, defendants Norweb plc (a public limited company registered in England and in Wales), Norweb Power Services (No 1) Limited, and Northern Hydro Limited (collectively "Norweb(s)"), on Indeck(s)' breach of contract and equitable estoppel claims, under section 2-1005 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1005 (West 1996) (section 2-1005)) and dismissing with prejudice Indeck(s)' tortious interference with contract and civil conspiracy claims asserted against third party and ultimate purchasers, defendants Calpine Auburndale, Inc. and Calpine Gordonsville, Inc. (collectively "Calpine(s)"), pursuant to section 2-615 of the Code (735 ILCS 5/2-615 (West 1996) (section 2-

615)).  The non-contracting partner, the Mission Entities (Mission(s))
(footnote: 1) also sued by Indeck(s), settled their differences with Indeck(s) and are not parties to this appeal.

Under the two purchase agreements, Norweb(s) intended to convey to Indeck(s) their general partnership interests in two limited partnerships, Auburndale Power Partners (Auburndale), and Gordonsville Energy (Gordonsville), for an amount in excess of $40 million.  Mission(s) were pre-agreement general partners with Norweb(s) in the Auburndale and Gordonsville limited partnerships.  Mission(s) exercised their pre-existing partnership rights of first refusal and denial of permission to sell, and designated Calpine(s) as purchasers of the subject partnership interests instead.  Norweb(s) thereafter sold their interests to Calpine(s).  Indeck(s) instituted this action, with the results noted above.

Indeck(s) presents as issues on appeal whether the circuit court erred in granting (1) Norweb(s)' section 2-1005 motion for summary judgment on Indeck(s)' contract claims; (2) summary judgment in favor of Norweb(s) on Indeck(s)' equitable estoppel claims; (3) Calpine'(s) section 2-615 motion to dismiss and dismissing with prejudice Indeck(s)' tortious interference with contract claims; and (4) in dismissing with prejudice Indeck(s)' civil conspiracy claims.  

On March 28, 1996, Norweb(s) announced their intention to sell their 50 percent general partnership interests in the Auburndale and Gordonsville limited partnerships, which own and operate power generation facilities in Florida and Virginia, respectively.  Auburndale was a partnership consisting of Norweb Power (a 50% general partner), and Mission(s)' El Dorado (a 1% general partner), and Devereaux (a 49% limited partner).  Gordonsville was a partnership consisting of Norweb(s)' Northern Hydro (a 50% general partner), and Mission(s)' Rapidan (a 1% general partner), and Madison (a 49% general partner). 

In July 1996, Norweb(s), caused an information memorandum to  be sent to potential qualified bidders, including Indeck(s), inviting bids in connection with  Norweb(s)' intended sale of their partnership interests in Auburndale and Gordonsville.  Prospective bidders were advised by Norweb(s) that the transfers of their partnership interests in both Auburndale and Gordonsville were subject to the rights of first refusal, denial of permission to sell, and designated purchaser, held by the existing general partners of each partnership.  

It was at this procedural juncture, according to Indeck(s), that Mission(s) and Calpine(s) concocted a scheme to skew the entire procedure in favor of purchase by Calpine(s), in return for Mission(s)' refusal to consent to the sale and designation of Indeck(s) as purchaser, in return for a $7 million payment to Mission(s) by Calpine(s).  As other potential bidders were evaluating Norweb(s)' offering materials, Calpine(s) and Mission(s) discussed "partnering" on acquiring Norweb(s)' sale assets and planned for Calpine(s) to acquire Norweb(s)' interests in the Auburndale and Gordonsville plants by agreeing not to bid on them in Norweb(s)' bidding process.  Instead, Mission(s) would designate Calpine(s) as purchaser under its rights in the partnership agreements once Norweb(s) had entered into contracts to sell the partnership interests to the winning bidder.  Meanwhile, unaware of the Mission(s)-Calpine(s)' arrangement, Indeck(s) submitted its bid for Norweb(s)' interests and was put on a short list, which Norweb(s) disclosed to Mission(s).  Ultimately, Indeck(s) was selected by Norweb(s) as the preferred bidder and entered final negotiations to purchase Norweb(s)' interests.

As Norweb(s) and Indeck(s) were finalizing the terms of the Auburndale and Gordonsville purchase agreements, Mission(s) and Calpine(s) allegedly furthered their plan to pre-empt Indeck(s)' acquisition of these interests.  By February 1997, Mission(s) had agreed to allow Calpine(s) to acquire the Auburndale and Gordonsville interests, as demonstrated by an internal Calpine(s)' memorandum dated February 7, 1997, which noted that "Mission expects to receive formal notice of [an] offer to Norweb to buy 50 percent of the Auburndale and Gordonsville projects by February 7, 1997.  Mission will give Calpine the opportunity to match this offer."
(footnote: 2) 

By late March 1997, Indeck(s) alleged agreement on the terms of definitive purchase and sale agreements had been reached for the sale of Norweb(s)' 50 percent partnership interest in Auburndale to Indeck Auburndale, L.L.C., and for the sale of Norweb(s)' Northern Hydro's 50 percent partnership interest in Gordonsville to Indeck Gordonsville, L.L.C. 

Both purchase and sale agreements contained representations and warranties to be exchanged between Indeck(s) and Norweb(s).  One provision specified Norweb(s)' "seller's knowledge" obligations, section 5.1 of each agreement, requiring Norweb(s) to make "all inquiries *** that are reasonably necessary to permit Seller to make such representation or warranty on a fully informed basis."
(footnote: 3)  Both agreements also contained the representations in section 5.2(n) that Norweb(s) sent to Mission(s) to review, under which Norweb(s) and its affiliates represented and warranted to Indeck(s) that, other than the seller and the Mission(s) partners in the respective partnerships, "no Person has any right to or interest in the Partnership, and there is not outstanding any option, warrant, right of first refusal, or other right to acquire the Partnership [or the Mission partners] or any direct or indirect interest therein, nor does the Partnership [or the Mission partners] have any agreement to issue any such option, warrant, right of first refusal, or other right."
(footnote: 4)
Both agreements also imposed obligations on Norweb(s) to seek  Mission(s)' consent and on Norweb(s) themselves to guarantee the performance of their subsidiaries' obligations.  Section 5.5 of both agreements required Norweb(s) as the seller to use their best efforts "to obtain the satisfaction of the Conditions *** in Section [] 4.1 [the '
CONDITIONS TO CLOSING
,' purchaser's obligations] *** as soon as possible."
(footnote: 5)
One week after the purchase agreements were signed, however, on April 11, 1997, Mission(s) informed Indeck(s) orally that it would exercise its rights of first refusal under the partnership agreements.  On May 16, 1997, Mission(s), through its subsidiary El Dorado, served notice that it exercised its right of first refusal under the Auburndale Partnership Agreement and designated defendant Calpine Auburndale, Inc., one of Calpine(s)' subsidiaries, to purchase this interest.  On the same date, Rapidan, Mission(s)' general partner for Gordonsville, served notice that it designated Calpine Gordonsville, Inc., another of Calpine(s) subsidiaries, to purchase the general partnership interest of Norweb(s)' Northern Hydro in the Gordonsville partnership.

At the same time, it is alleged, Mission(s) and Calpine(s) entered into an agreement under which Mission(s) granted Calpine(s) rights of first refusal in all of Mission(s)' east coast cogeneration facilities, including Mission(s)' interests in Auburndale and Gordonsville, for which Calpine(s) agreed to pay Mission(s) the $7 million fee upon the closing of the transactions with the Calpine(s) affiliates.  Calpine(s) allegedly derived this $7 million figure from the value of Norweb(s)' Auburndale and Gordonsville interests.

After Indeck(s) objected to the designation of Calpine(s) to purchase Norweb(s)' partnership interests, Norweb(s) asserted that the purchase agreements with Indeck(s) remained in force.  On June 4, 1997, however, Calpine(s) directed Norweb(s) by letter to terminate its dealings with Indeck(s).  Following these and other directions from Calpine(s), Norweb(s) ceased all actions to effect the transfer of the Auburndale and Gordonsville interests to Indeck(s). 

On June 11, 1997, Indeck(s) filed their initial complaint in this case in the circuit court of Cook County.  The case was removed to the United States District Court for the Northern District of Illinois on June 27, 1997, where the district court  granted Indeck(s)' request for expedited discovery in connection with their motion for a preliminary injunction to enjoin the sales of the partnership interests by Norweb(s) to Calpine(s).  Documents were exchanged, and a dozen individuals were deposed both in the United States and in England.  After Calpine(s) intervened, but before the preliminary injunction motion was decided, the case was remanded to the circuit court of Cook County on September 2, 1997, where Indeck(s)' motion for a temporary restraining order was denied on September 5, 1997.
(footnote: 6)
Norweb(s) joined in Mission(s)' motion to dismiss the amended complaint on August 22, 1997; however, before the circuit court ruled, Indeck(s) was granted leave to file a second amended complaint at law seeking compensatory and punitive damages on September 30, 1997.  The second amended complaint alleged three causes of action against Norweb(s):  breach of contract, fraud, and equitable estoppel.  The case was then transferred from the chancery division to the law division.

On November 14, 1997, Norweb(s) moved to dismiss the second amended complaint, which the circuit court granted with respect to the fraud and equitable estoppel causes of action, but denied with respect to the breach of contract causes of action. 

On August 17, 1998, with leave of court, Indeck(s) filed their third amended complaint, in which they alleged breach of contract (count I) and equitable estoppel (count IV) claims against Norweb(s); actions against Calpine(s) for tortious interference with contract (count II) and conspiracy (count VI); and actions against Mission(s) for tortious interference with contract (count II), common law fraud (count III), equitable estoppel (count IV), and conspiracy (count VI)
(footnote: 7).   

Norweb(s) moved for summary judgment on September 18, 1998.  Prior to responding to the summary judgment motion, Indeck(s) deposed Gavin Young, Norweb(s)' in-house lawyer, and Norweb(s) produced all documents relating to the negotiation of the purchase agreements, including all correspondence and all closing documents.  Calpine(s) moved to dismiss the third amended complaint.  Mission(s) also moved to dismiss the third amended complaint on September 18, 1998, but settled with Indeck(s) before the court rendered a decision on their motion.

The circuit court granted Norweb(s)' motion for summary judgment, with prejudice, in its entirety, and granted  Calpine(s)' motion to dismiss the third amended complaint.  This appeal followed. 

I

Indeck(s) first contend that the circuit court erred in granting summary judgment in favor of Norweb(s) on their breach of contract claims alleged in count I of the third amended complaint, on the theory that the purchase agreements did not excuse Norweb(s) from their obligations to perform if Mission(s) failed to grant its consent or exercised its rights of first refusal.  In the alternative, Indeck(s) argue that even if the purchase agreements were terminated, Norweb(s) has not shown that they should be allowed to avoid liability under their terms.  

Indeck(s) argue that the circuit court erroneously imposed "implicit" partnership agreement terms into the purchase agreements contrary to its initial conclusion on the motions to dismiss the second amended complaint that "[n]either of the purchase agreements include the specific rights of withholding consent or the Right of First Refusal that are contained in the Partnership Agreements."  Indeck(s) urge that the court ignored the clear import of the parties' decision not to include a specific clause that would excuse Norweb(s)' obligations to perform if the consents were not obtained; ignored an affidavit which established that Norweb(s)' failure to obtain a "consents and approvals" clause paralleling  section 4.1(c) of the purchase agreements
(footnote: 8), was a negotiated term; and also ignored the fact that fair-minded persons could draw different inferences from the facts of this case.    

Summary judgment is properly granted where the pleadings, depositions, admissions on file and affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  735 ILCS 5/2-1005 (West 1996); 
Outboard Marine Corp. v. Liberty Mutual Insurance Co.
, 154 Ill. 2d  90, 102, 607 N.E.2d 1204 (1992); 
Mobil Oil Corp. v. Maryland Casualty Co.
, 288 Ill. App. 3d 743, 751, 681 N.E.2d 552 (1997).  Because this is an appeal from an order granting summary judgment not involving credibility determinations, our review of this case is 
de
 
novo
.  
Mobil
, 288 Ill. App. 3d at 751; 
Kleinwort Benson North America, Inc. v. Quantum Financial Services, Inc.
, 285 Ill. App. 3d 201, 209, 673 N.E.2d 369 (1996), 
aff'd
, 181 Ill. 2d 214, 692 N.E.2d 269 (1998).

Section 9.7 of the purchase agreements provides that they are to be "construed in accordance with and governed by the laws of the State of New York, excluding its conflicts of laws provisions.

Specifically, Indeck(s) assert that Norweb(s)' failure to insist upon a "consents and approvals" clause in section 4.2 of the purchase agreements indicates that Norweb(s)' obligations to sell under the purchase agreements were not excused if Mission(s) failed to give consent under section 9.3.1 of its partnership agreement with Norweb(s).
(footnote: 9)  The record reveals, however, that on October 3, 1996, Indeck(s) submitted an initial proposal to purchase Norweb(s)' partnership interests, Indeck(s)' offer making itself contingent upon obtaining written consent from the existing partners of Norweb(s).  Before submitting their formal written bid, Indeck(s)' due diligence review resulted in their receiving both the Auburndale Partnership Agreement and the Gordonsville Energy Partnership Agreement, which Indeck(s) and their counsel examined.  These agreements contained virtually identical provisions:  expressly giving Mission(s) the right of first refusal, denial of consent to sell, and the right to designate a third party to purchase Norweb(s)' partnership interests in the event that Norweb(s) proposed to sell those interests.  

From these documents it is clear that Indeck(s) knew of the condition precedent in order for Norweb(s) to sell their partnership interests, namely, that Mission(s) had to consent "to admission of the Successor General Partner," which could be withheld "in the sole and absolute discretion" of Mission(s) and could also be withheld "arbitrarily."  Each partnership agreement supplied to Norweb(s) for examination further provided that any transfer of a general partnership interest without the consent of the other general partner is "null and void," as against the partnership. 

Indeck(s) nevertheless proceeded with the proposed purchases with full knowledge of their potential abortion through the exercise by Mission(s) of its partnership rights.

Indeck(s) nevertheless claim that neither of the purchase agreements, or either version of section 5.1(c) attached thereto, referred to the possibility that Mission(s) would exercise their right of first refusal under the partnership agreements, nor did the purchase agreements purport to incorporate the terms and conditions of the partnership agreements which contained those rights.  Rather, Indeck(s) argue, the integration clauses in the purchase agreements made clear that the "entire understanding of the parties with respect to the matters herein" did not include the partnership agreements or potential rights of a non-selling partner to pre-empt the transaction.  Therefore, Indeck(s) assert, any knowledge that Indeck(s) had of Mission(s)' rights of first refusal was immaterial since those rights were not expressly made part of the parties' agreements.  

Both purchase agreements in their "ASSIGNMENT AND ASSUMPTION OF PARTNERSHIP INTEREST," clauses preceding the signature lines clearly and expressly stated, however, that they were being entered into "pursuant to the [Mission-Norweb] Partnership Agreements," providing that what was being sold included, among other things, "the rights and obligations of being a general partner in the Partnership[s] *** as such interests, rights and obligations are more fully described in the Partnership agreements."  Indeck(s) thereby were well aware, informed of and bound by Mission(s)' potential power to stop the sale, even before submitting their written purchasing proposals.  

Based upon the foregoing, the circuit court's conclusion that the purchase agreements excused Norweb(s) from their obligation to perform in the event Mission(s) exercised their right to first refusal or refused to consent to the purchase, or designated a different purchaser, must be upheld.

II

Indeck(s) next maintain that Norweb(s) breached their obligation to inquire regarding representations made to "seller's knowledge," as well as its section 5.2(n) warranties under the purchase agreements.  At the very least, they maintain, material issues of fact existed concerning Norweb(s)' admitted breaches of its investigation obligations, as well as breaches of the warranties, which Norweb(s) deliberately chose not to fulfill.  Norweb(s) delegated the responsibility of making all inquiries to permit it to make "seller's knowledge" representations on a "fully informed" basis to one of its in-house solicitors, Gavin Young.  In late January 1997, Young sent a letter to Mission(s)' in-house lawyer, which included the section 5.1 knowledge representation definition and the section 5.2(n) warranties Norweb(s) would make regarding the Auburndale and Gordonsville partnerships.
(footnote: 10)  Young sent his letter to Mission(s)' in-house lawyer, together with a general release under which Norweb(s) released Mission(s) and its affiliates from liability for any information they supplied in response.   Norweb(s)' "seller's knowledge" inquiries to Mission(s) were answered in correspondence to Peter Goldsworthy, Norweb(s)' managing director.  Mission(s)' wholly owned subsidiary, El Dorado, advised, among other responses, that it "will not comment upon the items set forth in the last sentence of subsection 5.2(n)," 
i.e.
, the sentence that represented "seller's knowledge" that Mission(s) had no agreements to sell any direct or indirect interests it had in the Auburndale partnership, including options, rights of first refusal or any other right.  In correspondence of the same date, regarding the Gordonsville partnership, Mission(s)' wholly owned subsidiary, Rapidan, also refused to comment on the last sentence of subsection 5.2(n). 

Aware that Mission(s) refused to respond to its request for section 5.2(n) information, Norweb(s) allegedly knew that it could not make the warranty on a "fully informed basis" as section 5.1 required.  Norweb(s) nonetheless decided not to make "all inquiries" on this issue and knowingly determined to do nothing with respect to Mission(s)' position that it would not comment on the 5.2(n) representation.  Norweb(s) also consciously decided to withhold this information from Indeck(s), assertedly with full knowledge and acceptance of the consequences of its actions.
(footnote: 11) 

Illinois and New York both recognize that an express warranty is a creature of contract which a warrantor has created or agreed to by making the requisite affirmation as part of a contract to which it is an adjunct.  
Collins Co., Ltd. v. Carboline Co.
, 125 Ill. 2d 498, 509, 532 N.E.2d 834 (1988).  An express warranty given by a seller in a purchase agreement is as much a part of the contract as any other term.  
CBS, Inc. v. Ziff-Davis Publishing Co.
, 75 N.Y.2d 496, 503, 553 N.E.2d 997, 1001 (1990) (
CBS
), and amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue.  
Metropolitan Coal Co. v. Howard
, 155 F.2d 780, 784 (2d Cir. 1946) (
Metropolitan Coal
); 
CBS
, 553 N.E.2d at 1001.  Since representations and warranties are assurances upon which a party may rely, they are "intended precisely to relieve the promisee of any duty to ascertain the fact for himself ***."  
Metropolitan Coal
, 155 F.2d at 784.  A representation is operative even if the party to whom it is given does not believe it to be true.  See 
CBS
, 553 N.E.2d at 1001.  To recover on a warranty claim, a party need only show that the warranty is party of the contract, and is relied upon.  "[T]he right to indemnification depends only on establishing that the warranty was breached."  
CBS
, 553 N.E.2d at 1001.

A fact finder could well determine that a proper response to the section 5.2(n) inquiry would have required disclosure of the $7 million scheme between Mission(s) and Calpine(s) and that had Norweb(s) conducted the inquiry it had agreed and was required to conduct, it also would have obtained knowledge that Mission(s) planned to preempt the Indeck(s)-Norweb(s) transaction; otherwise, Norweb(s) was obligated to refrain from making the warranty.  There is a question of fact as to whether the warranties of section 5.2(n) were breached, perhaps repeatedly, as Mission(s)' right to first refusal scheme unfolded, because it could be concluded that the section 5.2(n) representations were not true as of the date the agreements were signed and that Mission(s)' promise to Calpine(s) made them false.  Based on the circumstances set forth above, reasonable inferences could be drawn that the warranties were breached when Mission(s) designated Calpine(s) to purchase Norweb(s)' partnership interests, and when Mission(s) granted Calpine(s) rights of first refusal in Mission(s)' interests in the Auburndale and Gordonsville partnerships.  The grant of summary judgment in this aspect of the case was error and must be reversed.  That portion of the case should be tried to judgment.  

Section 8.2(c) of the purchase agreements expressly makes Norweb(s) liable for all damages, including attorney fees, if the purchase agreements are terminated as a result of the "negligent or willful failure of Seller or Guarantor to perform its obligations hereunder."  Sections 8.3 and 8.4 of the Auburndale and Gordonsville agreements, respectively, provide that the section 8.2 provisions were intended to survive termination of the agreements.  

With regard to damages, Indeck(s) assert that they have lost profits and income directly flowing from Norweb(s)' contract breaches.  By expressly preserving the parties' rights to consequential damages, Norweb(s) and Indeck(s) specifically contemplated and agreed that Indeck(s) could bring a claim for the damages sought here.  Because the purchase agreements expressly allow for consequential damages, for this additional reason entry of summary judgment in this part of the case was error and must be reversed and the cause tried to judgment on the merits.

III

Indeck(s) next argue that the circuit court erred in granting summary judgment in favor of Norweb(s) on Indeck(s)' equitable estoppel claims alleged in count IV of the third amended complaint, which sought damages and to estop Norweb(s) from defending on the basis that Mission(s) would not have consented to Indeck(s)' admission to the partnerships.  They maintain that a jury could find that Goldsworthy's representations to Indeck(s), as well as his conduct, were calculated to convey the impression that the facts were otherwise than, and inconsistent with, those which Norweb(s) later asserted and could also conclude that Goldsworthy intended that his representations be acted upon.  Indeck(s) argue that given his understanding of the situation and Norweb(s)' deliberate decision not to inform Indeck(s) of Mission(s)' failure to comment on the "seller's knowledge" representations, a fair minded person could infer that Goldsworthy had actual or constructive knowledge of the true facts.  At the very least, he allegedly knew there would be problems obtaining consents.  

Under New York's view of estoppel, three elements must be established before estoppel may be imposed upon a party:

"(1) conduct which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intent that such conduct (representation) will be acted upon; and (3) knowledge, actual or constructive, of the true facts."  
Holm v. C.M.P. Sheet Metal, Inc.
, 89 A.D.2d 229, 233, 455 N.Y.S.2d 429, 432 (4
th
 Dep't 1982).

The circuit court correctly cited 
Holm
 in its memorandum order for the proposition that, under New York law, equitable estoppel operates merely to preclude the denial of a right claimed otherwise to have arisen and correctly rejected Indeck(s)' argument that Norweb(s) should be equitably estopped from denying that "full and complete consent to the admission" of Indeck(s) partners in the partnerships would have been given.  

Estoppel may not be invoked to compel performance of an act which is beyond the power of the other party to perform.  Here, Mission(s), not Norweb(s), had the power to give or withhold consent to Indeck(s)' admission as partners.  Indeck(s) had no independent right to demand and secure such consents or admission. 

Further, Indeck(s) failed to sustain a claim for estoppel because they did not raise any issue of fact that Mission(s)' consents would have been forthcoming had Norweb(s) conducted themselves differently.  In fact, as Indeck(s) themselves have previously asserted, Mission(s) and Calpine(s) already had agreed that Calpine(s) would be the designated and approved purchaser before Indeck(s) even submitted their final proposals to purchase.

The circuit court correctly entered summary judgment for Norweb(s) on the equitable estoppel claims.

IV

Indeck(s) next contend that the circuit court improperly granted Calpine(s)' section 2-615 motion to dismiss their tortious interference with contract claims alleged in count II of their third amended complaint.  Indeck(s) argue that Calpine(s) assumed in their section 2-615 motion to dismiss that they had conditional privileges to interfere with Indeck(s)' contracts and that Indeck(s) bore the burden of pleading and proving that no privilege could apply.  Because Calpine(s) did not meet their burden of pleading and proving their affirmative defense of conditional privilege and because the allegations of the third amended complaint showed that they exceeded any privilege they may have had even if Indeck(s) did bear the burden, Indeck(s) assert the court erred in dismissing their claims, improperly requiring Indeck(s) to plead and prove lack of justification.  

A motion to dismiss under section 2-615 attacks the legal sufficiency of the complaint.  
Vernon v. Schuster
, 179 Ill. 2d 338, 344, 688 N.E.2d 1172 (1997) (
Vernon
).  A section 2-615 motion alleges only defects on the face of the complaint; it does not raise affirmative factual defenses.  
Vernon
, 179 Ill. 2d at 344; 
Hirsch v. Feuer
, 299 Ill. App. 3d 1076, 1081, 702 N.E.2d 265 (1998) (
Hirsch
).  All well-pleaded facts in the complaint are taken as true and the court must determine whether the complaint's allegations, when interpreted in the light most favorable to the plaintiff, are sufficient to establish a cause of action upon which relief may be granted.  
Hirsch
, 299 Ill. App. 3d at 1081.  The standard applied when reviewing the dismissal of a complaint pursuant to section 2-615 is 
de
 
novo
.  
Vernon
, 179 Ill. 2d at 344; 
Hirsch
, 299 Ill. App. 3d at 1081.

To state a cause of action for tortious interference with an existing contract, a plaintiff must allege:  (1) the existence of a valid and enforceable contract between plaintiff and another; (2) defendant's awareness of the contractual obligation; (3) defendant's intentional and unjustified inducement of a breach of contract; (4) a subsequent breach by the other caused by defendant's wrongful conduct; and (5) damages.  
HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.
, 131 Ill. 2d 145, 154-55, 545 N.E.2d 672 (1989).  An individual is privileged to interfere with a contract when he acts to protect an interest "which the law deems to be of equal or greater value than the plaintiff's contractual rights."   
HPI Health Care Services, Inc.
, 131 Ill. 2d at 157.  Where it is apparent from the face of the complaint that the interference was privileged, the burden is on plaintiff to allege specific facts establishing that defendant's conduct was unjustified or malicious.  
HPI Health Care Services, Inc.
, 131 Ill. 2d at 156.   

Here, Mission(s)' consent was an express condition to Norweb(s)' obligation to transfer its partnership interests to Indeck(s).  Mission(s)' decision to withhold consent is fatal to Indeck(s)' claim for tortious interference with contract.  Without Mission(s)' consent, there were no actionable contractual rights that could have been the subject of interference by Mission(s) or Calpine(s).  As Indeck(s), themselves, acknowledge, the understanding between Mission(s) and Calpine(s) was reached before Indeck(s)' proposed purchase was finalized.  At that time, the identity of the successful bidder was unknown to any party.  

As previously recognized, Indeck(s)' right to acquire Norweb(s)' partnership interests, and Norweb(s)' right to transfer its partnership interests to Indeck(s), were conditioned upon Mission(s)' consent.  Norweb(s) could not force Mission(s) to accept Indeck(s).  Further, the purchase and sale agreements call for the transfer of Norweb(s)' partnership interests to be effected by Indeck(s)', Norweb(s)' and Mission(s)' execution of assignment and assumption agreements, which were attached to the purchase and sale agreements.  They, too, require Mission(s)' consent.
(footnote: 12) 

From the foregoing it is clear that Indeck(s) did not and could not plead a viable tortious interference with contract claim against Calpine(s).  The circuit court so held and must be affirmed.

V

In its last contention, Indeck(s) argue that the dismissal with prejudice of the civil conspiracy claims was improper because the circuit court made no independent ruling with respect to their civil conspiracy claims and appears to have dismissed the claims on the grounds that there was no underlying tort to support the civil conspiracy claims, not because the proper elements of civil conspiracy were not pled.  They argue that their third amended complaint made clear that Mission(s) and Calpine(s) as co-conspirators employed tortious means to plan, agree upon, and implement their conspiracy through the first refusal scheme.  Because the elements of civil conspiracy were adequately pled in count VI, and because the underlying tort of tortious interference with Indeck(s)' contracts was properly pled as well, they allege the court erred in granting the motion to dismiss with prejudice.

In order to allege a cause of action for conspiracy, Indeck(s) was required to allege with specific facts an agreement between Mission(s) and Calpine(s), and a tortious act committed in furtherance of that agreement.  
McClure v. Owens Corning Fiberglas Corp.
, 188 Ill. 2d 102, 133, 720 N.E.2d 242 (1999).  Here, Indeck(s)' conspiracy claim sets forth only conclusions as to a tortious agreement between Calpine(s) and Mission(s) or a tortious act committed in furtherance of such an agreement.  Indeck(s)' conspiracy claim fails for the same reasons that it was unable to state a cause of action for tortious interference with contract.  Characterizing a combination of acts as a conspiracy is insufficient to withstand a motion to dismiss.  
Buckner v. Atlantic Plant Maintenance, Inc.
, 182 Ill. 2d 12, 23-24, 694 N.E.2d 565 (1998).

Furthermore, a conspiracy is not an independent tort.  Where, as here, a plaintiff fails to state an independent cause of action underlying its conspiracy allegations, the claim for a conspiracy also fails.  See 
Adcock v. Brakegate, Ltd.
, 164 Ill. 2d 54, 645 N.E.2d 888 (1994); 
Davis v. Times Mirror Magazines, Inc.
, 297 Ill. App. 3d 488, 499, 697 N.E.2d 380 (1998).

Accordingly, the dismissal of the alleged conspiracy assertions was proper.

From the foregoing, the circuit court's dismissals and entries of summary judgments must be upheld, except for the grant of summary judgment upon Indeck(s)' allegations relating to Norweb(s) breaches of warranties as to "sellers knowledge" and section 5.2(n) of the purchase agreements, as discussed in point II of this opinion, which is reversed and remanded for trial.

Affirmed in part, reversed in part, and remanded with directions.

THEIS, P.J., and QUINN, J., concur.

FOOTNOTES
1:
Mission(s) are comprised of parent company Edison Mission Energy and its wholly owned subsidiaries El Dorado Energy Company (El Dorado), Devereaux Energy Company (Devereaux), Rapidan Energy Company (Rapidan), and Madison Energy Company (Madison).

2:
One week later, on February 14, 1997, another Calpine(s)' memorandum noted the following:

"Mission has provided Calpine with the significant project documents for both Auburndale and Gordonsville, as well as financial projections.  Norweb has not yet submitted to Mission the terms of the winning bid for it's [sic] 50% share of these two projects. Upon receipt of this bid, Mission, or it's [sic] designee, has 45 days to exercise a right of first refusal. 
Mission has indicated to Calpine that it will have an exclusive opportunity to act as Mission's designee
."  (Emphasis added.)

3:
Article V, "
REPRESENTATIONS, WARRANTIES AND COVENANTS
," section 5.1 of the purchase agreements provides:

"Section 5.1 
Representations and Warranties of Seller.  Whenever a representation or warranty made by Seller in this Agreement is made to Seller's knowledge, it shall mean the actual knowledge of Seller
, Guarantor and Norweb Generation Limited 
after making all inquiries
 of El Dorado, the members of the Management Committee of the Partnership and the Executive Director of the Partnership 
that are reasonably necessary to permit Seller to make such representation or warranty on a fully informed basis
.  Seller hereby represents and warrants to Purchaser as of the Closing Date that:" (Emphasis added.)

4:
Section 5.2(n) of the purchase agreements state:

"[Section 5.2](n) 
No Other Interests
.  Other than El Dorado, Devereaux and Seller, no Person has any right to or interest in the Partnership, and there is not outstanding any option, warrant, right of first refusal, or other right to acquire the Partnership, El Dorado or Devereaux or any direct or indirect interest therein, 
nor does the Partnership, El Dorado or Devereaux have any agreement to issue any such option, warrant, right of first refusal, or other right
.  Effective upon the Closing, Purchaser has full and valid title to a fifty percent (50%) general partnership interest in the Partnership, free and clear of any Encumbrances except those, if any, created by Purchaser.  
Except for the rights or interests of Seller, to Seller's knowledge, there is no outstanding option, warrant, right of first refusal, or other right to acquire El Dorado's general partnership interest or Devereaux's limited partnership interest in the Partnership or any direct or indirect interest therein, nor does El Dorado nor Devereaux have any agreement to issue any such option, warrant, right of first refusal or other right
."  (Emphasis added.)

5:
Among the "
CONDITIONS TO CLOSING
" bearing upon the issues are section 4.1(b) and (c) of Article IV, as follows:

"Section 4.1 
Conditions to Purchaser's Obligation
.  Purchaser's obligation to purchase the Acquired Interest on the Closing Date shall be subject to the satisfaction or the waiver by Purchaser, in its sole discretion, of each of the following conditions:

* * *

(b) 
Representations and Warranties True
.  
There shall be no Material Adverse Change (considered in the aggregate) in the representations and warranties of Seller contained in Sections 5.1, 5.2 and 7.1
 and in any estoppel letter delivered pursuant to Section 4.1(g) hereof, and Purchaser shall have received a certificate dated as of the Closing Date as though such representations and warranties were made on and as of the Closing Date attesting to such effect signed by a duly authorized officer of Seller on behalf of Seller, and Seller shall have complied with all of the covenants required by Section 5.4 of this Agreement to be performed by it at or prior to the Closing Date, and Purchaser shall have received a certificate of Seller dated as of the Closing Date attesting to such effect signed by a duly authorized officer of Seller on behalf of Seller.

(c) 
Consents and Approvals
.  
All Consents and Approvals set forth in Schedule 5.1(c) shall have been duly obtained, made or provided, as the case may be, and shall be in full force and effect
."  (Emphasis added.)

6:
Calpine(s) entered into separate agreements with Norweb(s) to purchase the Auburndale and Gordonsville partnership interests, which transactions closed in October 1997.  

7:
The third amended complaint does not appear to contain a count V.

8:
The text of section 4.1(c) is set forth in footnote 5.

9:
Section 4.2 of the purchase agreement reads in part:

"Section 4.2 
Conditions to Obligations of Seller
.  Seller's obligation to sell the Acquired Interest on the Closing Date shall be subject to the satisfaction or the waiver by Seller in its sole discretion, of each of the following conditions:

(a) 
Proceedings Satisfactory, Etc.

(i) All matters in connection with the transactions contemplated hereby, and all the legal matters, documents and instruments incident thereto, shall be reasonably satisfactory in form and substance to Seller and its legal counsel, and Seller shall have received all documents and instruments as may reasonably be requested by Seller or its legal counsel; and

(ii) Purchaser shall have taken all actions required to be taken by Purchaser as of the Closing Date under Article II hereof."

10:
See text of paragraph 5.2(n) at footnote 4.

11:
Norweb(s)' counsel made this clear in a deposition filed in the circuit court in which Norweb(s)' counsel, Gavin Young, asserted that he did not inform Indeck(s) of Mission(s)' refusal to respond to the section 5.2(n) inquiry because:

"We [Norweb(s)] do not have a duty to disclose information, we give a representation and we are allowed to qualify that representation if we chose to do so.

And for the reasons I have given we chose not to pursue that particular response from Mission and not to specifically raise it with Indeck.

* * *

We accepted *** the consequence[s] of not disclosing that information to Indeck; yes."

12:
The assignment and assumption agreements state as follows:

"[Mission] hereby consents to the assignment of the Acquired Interests pursuant to this Assignment and Assumption, and the admission of [Indeck] as general partner of the partnership."