RBC MORTGAGE COMPANY, f/k/a Prism Mortgage Company, *et al.*, Plaintiffs-Appellants, v. NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, Defendant-Appellee.

First District (4th Division)   No. 1—03—0776

Opinion filed June 30, 2004.

Wildman, Harrold, Allen & Dixon, of Chicago (David J. Fischer and Samuel S. Cohen, of counsel), for appellants.

Clausen Miller, P.C., of Chicago (Randall I. Marmor, Melinda S. Kollross, and Agelo L. Reppas, of counsel), for appellee.

JUSTICE HARTMAN delivered the opinion of the court:

Plaintiffs, RBC Mortgage Company (RBC) (formerly Prism Mortgage Company) and First City Financial Corporation (First City) appeal from the circuit court's section 2—615 (735 ILCS 5/2—615 (West 2000)) dismissal of their action for indemnity under a financial institution bond issued by defendant, National Union Fire Insurance Company of Pittsburgh (National Union). On review, RBC and First City (sometimes collectively RBC) contend that the court erred in finding that the bond does not afford coverage to RBC for payments made to a third party under a settlement agreement.

First City is a wholly owned subsidiary of RBC, a mortgage banking company. From March 1, 1999, to December 3, 1999, First City employed Brandon Earl as a loan officer in its Utah branch. There, Earl prepared loan packages for potential home mortgage borrowers, which consisted of various financial documents used to evaluate creditworthiness. Earl originated a fraudulent loan package for himself in the amount of $450,000 and put in the name of his wife, Andrea Earl. In an effort to conceal his own loan, Earl compiled fraudulent packages for other borrowers. The packages contained fabricated documents necessary to close the loan, including counterfeit credit reports, falsified appraisals and forged income verifications. To facilitate the scheme, Earl paid off the various providers of the tainted documents. Earl collectively submitted the packages for sale from First City, as a broker, to Evergreen Moneysource Mortgage Company (EMMC), which funded the loans and ultimately sold them to third-party investors.

Under the brokerage agreement between EMMC and First City, EMMC retained sole discretion to approve and fund the loans, relying on the packages submitted by First City. Once the loans were funded and closed they became the property of EMMC, which paid First City a brokerage fee in return. EMMC assumed the risk of any losses associated with interest rate fluctuations, loan servicing, and change in the market value of the property. A warranty provision in the brokerage agreement guranteed that the loan packages submitted by First City would not contain any untrue statements and, if breached, First City was obligated to indemnify EMMC for any resultant losses.

In early December of 1999, First City's Utah branch manager, Sue Bitterman, uncovered Earl's self-funded loan. Bitterman then initiated an audit of all loan packages originated by Earl. By the end of January of 2000, First City confirmed the fraud; however, Earl's loan for $450,000 already had been funded and sold to third-party inves-

tors. First City immediately notified EMMC of the fraud, and, on January 13, 2000, EMMC requested that First City confirm its obligation to bear the risk of the warranted, but fraudulent loans. Days later, First City informed National Union that it would seek coverage under the bond, should it incur losses as a result of the fraud.

The insuring agreement between First City and National Union was in the form of a financial institution bond or fidelity bond, in effect from March 1, 1999, to March 1, 2002.[1] Under "Insuring Agreement A" entitled "Fidelity," National Union promised to indemnify RBC for:

"(A) Loss resulting directly from dishonest or fraudulent acts committed by an [e]mployee acting alone or in collusion with others.

Such dishonest conduct or fraudulent acts must be committed by the [e]mployee with the manifest intent:

(a) to cause the Insured to sustain such loss; and

(b) to obtain financial benefit for the [e]mployee or another person or entity."[2]

The policy does not provide a definition for "loss resulting directly from" and excludes from coverage generally "indirect or consequential loss of any nature." The agreement permitted National Union to "elect" whether to provide a defense for RBC in the event of a claim against it.

On March 17, 2000, EMMC commenced an action against First City,[3] requesting (1) damages for losses incurred in reliance on the

---

[1]The fidelity bond has a $4 million aggregate liability limit, a $2 million single loss limit, and a $25,000 single loss deductible.

[2]Before the circuit court, RBC sought coverage under the bond's "Insuring Agreement A" entitled "Fidelity," as well as "Insuring Agreement E" entitled "Securities." The latter agreement covers "[l]oss resulting directly from the Insured having, in good faith for its own account or for the account of others, (1) acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith of, any original *** (c) deed, mortgage or other instrument conveying title to, or creating or discharging a lien upon, real property." On appeal, RBC offers no argument in support of gaining coverage by way of "Insuring Agreement E." Under Supreme Court Rule 341(e)(7), "[p]oints not argued are waived." 210 Ill. 2d R. 341(e)(7). "A point not argued *** fails to satisfy the requirements of Rule 341(e)(7)." *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 493, 771 N.E.2d 357 (2002). Accordingly, the issue of whether coverage exists under "Insuring Agreement E" is not the subject of this appeal.

[3]On May 24, 2001, EMMC amended its complaint to name as an additional defendant RBC, which notified National Union on June 21, 2001.

fraudulent loan packages, and (2) that First City buy back the defective loan packages. On April 14, 2000, First City notified National Union of the suit; however, National Union declined to provide a defense or commit to coverage.

Over 14 months later, on June 20, 2001, RBC sent a proof of loss to National Union on behalf of First City and RBC, as First City's guarantor. The parties reached an "agreement in principle" to settle the suit. On October 10, 2001, EMMC and First City finalized a settlement agreement, wherein RBC agreed to pay to EMMC $175,000 for losses already incurred and to indemnify EMMC for any future losses traceable to the fraud. RBC also promised to compensate directly one of EMMC's investors, Conseco Finance Corporation, for related losses not yet incurred. RBC provided National Union with drafts of the settlement agreement, supplementing its proof of loss previously tendered. In a letter to RBC dated November 28, 2001, National Union denied the claim, asserting that RBC's losses did not result "directly" from the fraud.

On May 31, 2002, RBC filed a four-count complaint against National Union, alleging claims for declaratory judgment, breach of contract, attorney fees and costs, and prejudgment interest. On August 23, 2001, National Union moved to dismiss RBC's claims pursuant to section 2—615 of the Code of Civil Procedure (735 ILCS 5/2—615 (West 2000)) (section 2—615). On October 21, 2002, following oral argument, the circuit court granted the motion with prejudice, finding that (1) "[t]he language of the bond is not ambiguous," (2) "[n]either Insuring Agreement A nor E affords coverage because the loss was not a loss resulting directly from the covered risk," and (3) " '[d]irect loss,' as used in the bond, is not properly construed by analogy to proximate cause." The court commented that "courts throughout the land take surprisingly, a very, very narrow approach to fidelity bonds with regard to this issue of direct loss. *** [T]o suffer a direct loss[,] it's got to be a situation where the employee puts his hand in the employer's pocket. And if it turns out that the loss occurred as a consequence of the involvement of a third party[,] that's not what fidelity bonds insure against."

On November 27, 2002, RBC moved the circuit court to reconsider and vacate its ruling, which the court denied on February 4, 2003. RBC timely appeals.

## I

On appeal, RBC maintains that National Union denied coverage for the very risk it contemplated in purchasing the bond. RBC contends: (A) the circuit court erred in finding "direct loss" to be

unambiguous, and the language must be construed strictly against National Union as drafter of the policy; and (B) the question of whether the loss is direct or not should be examined under the "proximate cause" standard, which would give rise necessarily to unresolved questions of fact. RBC requests that the matter be remanded for further proceedings.

■ The question presented by a section 2—615 motion to dismiss is whether sufficient facts have been pled in the complaint which, if proved, would entitle plaintiff to relief. *Thornton v. Shah*, 333 Ill. App. 3d 1011, 1020, 777 N.E.2d 396 (2002). All well-pleaded facts in the complaint are taken as true and are construed in the light most favorable to plaintiff. *Indeck North American Power Fund, L.P. v. Norweb PLC*, 316 Ill. App. 3d 416, 430, 735 N.E.2d 649 (2000). A complaint is susceptible to dismissal under section 2—615 only when it clearly appears that no set of facts could be proved under the pleadings that would entitle plaintiff to relief (*Casualty Insurance Co. v. Hill Mechanical Group*, 323 Ill. App. 3d 1028, 1033, 753 N.E.2d 370 (2001)) and where the circuit court can determine the relative rights of the parties solely from the pleadings. *Thornton*, 333 Ill. App. 3d at 1020. To state a cause of action adequately, the claim must be both legally and factually sufficient, setting forth a legally recognized claim as its basis, as well as pleading facts that are cognizable legally. *Casualty Insurance Co.*, 323 Ill. App. 3d at 1033. A complaint dismissed under section 2—615 requires the reviewing court to apply a *de novo* standard of review. *Indeck*, 316 Ill. App. 3d at 431.

### A

RBC argues that it incurred "direct" losses from the dishonest and fraudulent conduct of its employee, Earl. These losses, it urges, emanate from the settlement agreement with EMMC and manifest themselves in the form of a reduced market value of the fraudulent loans it repurchased from EMMC and the compensatory payments made to EMMC for losses already incurred. RBC construes these losses as "flow[ing] 'directly' from the dishonesty of [its] employee." RBC insists that, as the insured, the bond's language should be construed broadly in its favor and strictly against National Union.

National Union counters that RBC is "attempting to manipulate a first party fidelity bond to deflect third party liability to their insurer." It argues RBC suffered no losses where EMMC, not First City, actually funded the loans and that RBC could not have lost the loans' market value since EMMC never paid market value to RBC; instead, it paid only a brokerage fee. Even if Earl's fraud caused RBC to lose money, National Union maintains, the "losses are entirely derivative, based

solely on [RBC's] contractual liability to a third party," EMMC. For losses to be "direct," they must be immediate, definite, and ascertainable, such as in cases of theft or embezzlement. National Union points out that RBC did not file its proof of loss upon discovery of the fraud in December of 1999, or when it was sued by EMMC in March of 2000, but waited instead until June of 2001, once the settlement was reached.

■ Fidelity insurance is a form of insurance in which the insurer undertakes to guaranty the fidelity of an officer, agent, or employee of the insured, or to indemnify the latter for losses caused by dishonesty or a want of fidelity on the part of such a person. *State Street Bank & Trust Co. of Quincy v. United States Fidelity & Guaranty Co.*, 181 Ill. App. 3d 1081, 1087, 539 N.E.2d 779 (1989) (Lund, J., specially concurring); *Continental Corp. v. Aetna Casualty & Surety Co.*, 892 F. 2d 540, 543 (7th Cir. 1989); 11 Couch on Insurance § 160:1 (3d ed. 1998). Although there is no Illinois case addressing "direct loss" in the context of fidelity insurance, the law, as extrapolated from other jurisdictions, is resoundingly uniform on this issue.

Language in a fidelity bond, to the effect that the insured is covered for "losses directly resulting from," signifies a "direct loss" or the actual depletion of bank funds caused by the employee's dishonest acts. *Federal Deposit Insurance Corp. v. United Pacific Insurance Co.*, 20 F.3d 1070, 1080 (10th Cir. 1994); *Oriental Financial Group v. Federal Insurance Co.*, 309 F. Supp. 2d 216, 222 (D.P.R. 2004). If an employee's dishonesty causes losses to a third party, which then leads to litigation concluding in a judgment or settlement, the insured has not incurred a "direct loss" under a fidelity bond; the insured's loss is "indirect" and the third party's loss is "direct." *Aetna Casualty & Surety Co. v. Kidder, Peabody & Co.*, 246 A.D.2d 202, 210, 676 N.Y.S.2d 559, 566 (1998); *Auto Lenders Acceptance Corp. v. Gentilini Ford, Inc.*, 358 N.J. Super. 28, 36-37, 816 A.2d 1068, 1074 (2003) (*Auto Lenders*); *City of Burlington v. Western Surety Co.*, 599 N.W.2d 469, 472 (Iowa 1999); *Commercial Bank of Bluefield v. St. Paul Fire & Marine Insurance Co.*, 175 W. Va. 588, 596, 336 S.E.2d 552, 556 (1985). To find coverage in these circumstances would convert a direct-loss policy into a third-party indemnity policy or liability policy, under which the liability insurer indemnifies its insured for the insured's "indirect" loss, but payment, in practical effect, runs directly to the third-party claimant. *Auto Lenders*, 358 N.J. Super. at 37, 816 A.2d at 1073-74; *Central National Insurance Co., of Omaha v. Insurance Co. of North America*, 522 N.W.2d 39, 42 (Iowa 1994). In the absence of a third-party-claims clause, an insured's fidelity bond, unlike a liability policy, does not provide indemnity for vicarious liability for losses suffered by

others arising from its employee's tortious conduct. *The Vons Cos. v. Federal Insurance Co.*, 212 F.3d 489, 490-92 (9th Cir. 2000); *Lynch Properties Inc. v. Potomac Insurance Co. of Illinois*, 140 F.3d 622, 629 (5th Cir. 1998); *Foster v. National Union Fire Insurance Co.*, 902 F.2d 1316, 1318 (8th Cir. 1990).

In *Tri City National Bank v. Federal Insurance Co.*, 268 Wis. 2d 785, 674 N.W.2d 617 (App. 2003) (*Tri City*), a case strikingly similar to the instant case, the Court of Appeals of Wisconsin addressed the precise question presented in the case at bar. There, employees of a branch of the Tri City National Bank (Tri City) participated in a scheme with an outsider to obtain fraudulent mortgage loans for insufficiently funded borrowers, who otherwise would not have qualified for the loans. The outsider would recruit a buyer for property owned by him or one of his businesses and then have the buyer apply for a mortgage loan with one of two mortgage companies. The conspiring Tri City employees then would send to the mortgage company a fraudulent verification, indicating that the buyer had a bank account at Tri City containing funds sufficient to cover the down payment on the property. Once the mortgage was approved, a conspiring Tri City employee would issue a cashier's check for the recruited buyer to use at the closing, thereby creating the impression that buyer was providing the down payment from his own funds. After the loan funded, the outsider would take the loan proceeds to the bank, where he would pay for the cashier's check, and pay off the conspiring Tri City employees. *Tri City*, 268 Wis. 2d at 790, 674 N.W.2d at 619.

After defaults in the fraudulent loans, the scheme was discovered, and the mortgage companies sued Tri City to recover their losses. Tri City promptly notified its insurer, Federal Insurance Company (Federal), requesting confirmation that the fidelity bond in place covered Tri City for either judgments or settlements paid to the mortgage companies resulting from the fraud. Federal denied coverage on the ground that the bond covered only those losses "resulting directly from dishonest or fraudulent acts" of Tri City employees. Tri City settled the claims brought by the mortgage companies and then sought indemnity from Federal for the settlement amounts, but Federal continued to deny coverage. Tri City instituted a declaratory judgment action against Federal, which moved to dismiss the complaint. The circuit court granted the motion, reasoning that although Tri City experienced losses because of its employees' dishonest and fraudulent conduct, the claims asserted by the mortgage companies and ensuing settlement did not give rise to a loss directly resulting from dishonest or fraudulent acts of the employees. *Tri City*, 268 Wis. 2d at 791, 674 N.W.2d at 619-20.

On appeal, Tri City initially argued, as does RBC here, that the bond's language was ambiguous and should be construed in favor of Federal as drafter of the policy. The Court of Appeals of Wisconsin stated, "should there be any ambiguity, the wording of fidelity bonds is not construed strictly against the drafter because the justification behind the rule—unequal bargaining power—has been eliminated." *Tri City*, 268 Wis. 2d at 795, 674 N.W.2d at 622. The court also determined the operative language to be unambiguous, stating that "the bond clearly restricts indemnification to those losses that occur as a direct result of an employee's dishonest acts. This language is not susceptible to more than one meaning." *Tri City*, 268 Wis. 2d at 799, 674 N.W.2d at 623. The court noted that it was only after the mortgage defaults occurred, about three years after the fraudulent conduct, that Tri City's liability to the mortgage companies came into being. *Tri City*, 268 Wis. 2d at 799, 674 N.W.2d at 623.

In the case *sub judice*, it must be noted initially that the phrase "resulting directly from" is clear and unambiguous and must be afforded its plain and ordinary meaning. See *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 109, 607 N.E.2d 1204 (1992) (*Outboard Marine*). Despite RBC's insistence that the "policy language may be construed in more than one way," an ambiguity is not created simply because the parties disagree about the meaning of the policy language. *Installco Inc. v. Whiting Corp.*, 336 Ill. App. 3d 776, 783, 784 N.E.2d 312 (2002). Courts will not strain to find ambiguity in a policy where none exists (*McKinney v. Allstate Insurance Co.*, 188 Ill. 2d 493, 497, 722 N.E.2d 1125 (1999)), and, here, the language of the bond makes clear that indemnification is restricted to only those losses occurring as "direct" result of the employee's fraudulent acts. *Tri City*, 268 Wis. 2d at 799, 674 N.W.2d at 623. Although RBC observes correctly that the phrase is not defined in the policy, as are other terms, the mere absence of a definition does not itself render a policy term ambiguous. *Milwaukee Guardian Insurance Inc. v. Taraska*, 236 Ill. App. 3d 973, 974, 602 N.E.2d 70 (1992).

Because the phrase is unambiguous, the rules of construction need not be applied in interpreting the subject language of the fidelity bond. *Western Casualty & Surety Co. v. Brochu*, 105 Ill. 2d 486, 495, 475 N.E.2d 872 (1985). Nevertheless, First City is engaged in the business of mortgage brokering, and RBC, its parent company, is a corporate entity responsible for both mortgage brokering loans, as well as mortgage banking. In this capacity, RBC's bargaining power is not disparate from that of National Union and is undeserving of the usual rules of construction. See *Sharp v. Federal Savings & Loan Insurance Corp.*, 858 F.2d 1042, 1046 (5th Cir. 1988). The history of

Standard Form No. 24, the form at issue here, further compels this conclusion. See *Tri City*, 268 Wis. 2d at 793-99, 674 N.W.2d at 621-23. Therefore, despite RBC's protestations that it had a reasonable expectation of coverage for this type of loss, and that it would not have "purchased such useless protection" had it been aware that National Union "intended to limit coverage it afforded RBC to the 'paradigmatic cases of theft and embezzlement' " (see *Auto Lenders*, 358 N.J. Super. at 35, 816 A.2d at 1072), the policy will be applied as written. Courts will generally avoid interpretations that render contract terms surplusage (*Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 479, 693 N.E.2d 358 (1998)) and must strive to give each term in the policy meaning unless to do so would render the clause or policy inconsistent or inherently contradictory. *Outboard Marine*, 154 Ill. 2d at 123.

■ Under this framework, RBC's losses were derived, not directly from the conduct of Earl, but from RBC's breach of the warranty contained in the brokerage agreement with EMMC. Had there been no contractual liability on the part of RBC for the fraudulent loan packages, RBC would not have incurred monetary losses. EMMC, however, in electing to sue and, ultimately, seek a settlement from RBC, provided a distinct intervening cause displacing Earl's fraud as the direct cause of the losses. Earl's actions merely set into motion the chain of events that would later result in RBC's liability to EMMC.

Further, as in *Tri City*, RBC suffered no losses at the time of the fraud. Its losses did not come into being until after the settlement agreement, 1¹/₂ years after the fraudulent conduct. "This fact, in itself, illustrates the 'conditional nature' of the loss, taking it out of the policy." *The Vons Cos. v. Federal Insurance Co.*, 57 F. Supp. 2d 933, 944 (C.D. Cal. 1998), *aff'd*, 212 F.3d 489 (9th Cir. 2000). Since RBC is unable to plead facts that would entitle it to relief under the law, the circuit court's dismissal of its complaint was proper under section 2—615.

## B

■ RBC maintains that proximate cause is the proper standard to apply in determining whether a loss is direct or indirect. Of the various cases cited by RBC in support of a proximate cause analysis, only *Scirex Corp. v. Federal Insurance Co.*, 313 F.3d 841, 850 (3d Cir. 2002) (*Scirex*), and *Resolution Trust Corp. v. Fidelity & Deposit Co. of*

*Maryland*, 205 F.3d 615, 655 (3d Cir. 2000) (*Resolution Trust*), address "direct loss" in a similar context.[4]

In *Resolution Trust*, the United States Court of Appeals, applying New Jersey tort law to a fidelity bond coverage dispute, employed the proximate cause standard stating, "a proximate cause need not be the sole cause of harm. It suffices if it is a substantial contributing factor to the harm suffered." *Resolution Trust*, 205 F.3d at 656. In utilizing that standard, the *Resolution Trust* court relied on *Jefferson Bank v. Progressive Casualty Insurance Co.*, 965 F.2d 1274, 1281 (3d Cir. 1992) (*Jefferson*), where the court acknowledged that the phrase "resulting directly from" suggests a stricter standard of causation than mere proximate cause, and requires more than a substantial cause, since the words imply that the loss must flow "immediately," either in time or space, from the fraud. Despite this recognition, the *Jefferson* court applied Pennsylvania law and held that conventional proximate cause is the correct standard and an "immediacy" requirement to be inappropriate. *Jefferson*, 965 F.2d at 1281. The standard embraced in *Resolution Trust*, however, has been overruled effectively by the New Jersey Superior (appellate) Court in *Auto Lenders*, 358 N.J. Super. at 36, 816 A.2d at 1073, where the court rejected the notion that "any" proximate cause was sufficiently direct to warrant coverage, and explicitly "declin[ed] to adopt the proximate cause analysis."

Also, in *Scirex*, the Court of Appeals applied the proximate cause standard, relying on *Jefferson*. The court stated, "Pennsylvania law equates 'direct cause' " with " 'proximate cause' " (*Scirex*, 313 F.3d at 843-44), and "[w]e believe that [*Jefferson*'s] proximate cause approach is proper here" (*Scirex*, 313 F.3d at 850). In *Scirex*, employees for the insured, Scirex (a pharmaceutical-testing company), through their failure to follow protocol and deceptive record keeping, rendered worthless certain drug studies. As a result, Scirex was unable to procure and produce results for its contracted sponsor. Scirex was forced to replicate the studies for $1.2 million of its own funds. Scirex sought indemnity from its insurer, Federal, under a blanket employee dishonesty policy. Federal denied the claim, prompting Scirex to sue Federal for the losses. The court held that "Scirex's losses were directly tied to these studies[ ] and[,] by rendering those studies worthless, the [employees'] behavior proximately[ ] and[,] therefore directly, caused Scirex's losses." *Scirex*, 313 F.3d at 850.

---

[4]Whereas the other cases cited by RBC involve casualty insurance, *Resolution Trust Corp. v. Fidelity & Deposit Co. of Maryland*, 205 F.3d 615 (3d Cir. 2000), involved coverage under a fidelity bond, and *Scirex Corp. v. Federal Insurance Co.*, 313 F.3d 841 (3d Cir. 2002), concerned insurance policies providing coverage for blanket employee dishonesty.

In *Tri City*, the insured similarly argued that the "proximate cause" standard should govern the analysis of direct loss. The court, however, found the standard to be inapplicable in the context of employee dishonesty policies. The court noted that in the fidelity bond cases applying the proximate cause standard, causation was at issue only in the context of losses of the insured's own property, or that for which it was legally responsible, and the question to be resolved was whether some intervening event broke the causal connection between the dishonest conduct of an employee and the insured's loss. *Tri City*, 268 Wis. 2d at 801-02, 674 N.W.2d at 624-25.

In the present case, adopting the reasoning from the majority of other jurisdictions, the proximate cause analysis simply is too broad to capture accurately the intent behind the phrase "loss resulting directly from." A "direct loss" must be afforded its plain and ordinary meaning (*Auto Lenders*, 358 N.J. Super. at 36, 816 A.2d at 1073); "direct" means "direct." *Vons*, 212 F.3d 492. To equate "loss resulting directly from" with "loss proximately caused by" requires a strained reading of "direct loss," which is a much narrower concept than "proximately caused loss." This is because a proximate cause "need not be the sole cause nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which, in combination with it, causes the injury." *James v. Checker Taxi Co.*, 22 Ill. App. 2d 22, 24-25, 159 N.E.2d 12 (1959). Accordingly, the proximate cause analysis will not be applied to the case at bar.

For the reasons set forth above, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

QUINN, P.J., and GREIMAN, J., concur.