2025 IL App (1st) 230733

SECOND DIVISION
March 18, 2025

No. 1-23-0733

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| 540 NORTH LAKE SHORE DRIVE CONDOMINIUM ASSOCIATION, | ) ) ) | Appeal from the |
| Plaintiff-Appellant, | ) ) ) | Circuit Court of Cook County. |
| v. | ) ) | |
| MCZ DEVELOPMENT CORPORATION, MICHAEL LERNER, LAKE SHORE ACQUISITIONS, LLC, 540 LSD, LLC, CHICAGO TITLE LAND TRUST CO., MCZ URBAN LLC, 540 LAKE SHORE INVESTOR, LLC, THADDEUS WONG, and MICHAEL GOLDEN, | ) ) ) ) ) ) ) | Case Nos. 18 CH 15814 20 L 4330 (cons.) Honorable John Curry, Jr., Judge Presiding. |
| Defendants-Appellees. | ) ) | |

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Presiding Justice Van Tine and Justice Howse concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiff, the condominium association for the building at 540 North Lake Shore Drive, sued various defendants for what the complaint alleges was a systematic campaign to obtain sufficient voting control within the condo association, drive away other potential buyers with disinformation, and force a sale of the building—to them, defendants, at a price significantly below market value. After four years of litigation in two different lawsuits before three different judges, now consolidated before us here, the circuit court dismissed the third amended complaint. We affirm, finding no actionable claim for various reasons.

¶ 2                                       BACKGROUND

¶ 3      As we are reviewing the dismissal of the third amended complaint—call it the
"complaint," for ease—we take our facts from its allegations, which we assume to be true. See
*Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 31.

¶ 4      Plaintiff, the 540 North Lake Shore Drive Condominium Association (the Association), is
the governing body of a seven story, 149-unit condo building in Chicago's Streeterville
neighborhood (the Building). The Building's ground floor is separately owned and operated as
commercial property. The Building is one of the only "low-rise buildings" along Lake Shore
Drive, making it a valuable redevelopment property.

¶ 5      The Association's declaration allows the unit owners to de-convert the Building and sell
it as a whole. Consistent with the Condominium Property Act (765 ILCS 605/1 *et seq.* (West
2018)), the decision to sell the Building requires an affirmative vote of 75% of the unit owners.
That, of course, gives veto power to any bloc of votes representing over 25% of the owners.

¶ 6      Defendant Michael Lerner is the president of MCZ Development, "a real estate
development company that specializes in high-density infill development." Michael Golden and
Thaddeus Wong are co-founders of @Properties, "a large residential and commercial real estate
brokerage firm."

¶ 7      In January 2016, Lerner purchased two units in the Building. Shortly thereafter, he
partnered with Wong and Golden and, through their companies (the other defendants), began
purchasing more units within the Building. The Association claims the purpose of these
purchases "was to obtain a sufficient ownership percentage of the total number of Units to
oppose any sale of the Building to any third-party investors." Reaching this threshold would

allow defendants to "thwart competitive bidding" and "force the Association into selling the Building to [defendants] at a price tens of millions below a competitive market rate."

¶ 8    Beginning in 2017, defendants began a campaign of contacting the rest of the unit owners to purchase their units. Defendants' tactics included mass mailings and "robo calls" to allegedly mislead the owners into selling their units to defendants. The crux of this alleged scheme was defendants' misrepresentations regarding their ownership and control of the Building. Defendants' tactics were intended to "create a sense of panic and fear in individual Unit Owners that they would lose significant value in their investment in the condominiums if they did not sell immediately to Defendants." The "scheme" included a carrot, too—various "incentives," such as "covering all costs and commissions associated with the sale and, in some instances, by 'renting' those Units" back to the seller.

¶ 9    But defendants' efforts, according to the complaint, were not directed solely at the other unit owners. They also allegedly used their considerable connections in the real estate community to sow the seeds of disinformation. According to the complaint, they "contacted several developers which had indicated interest in the building *** to dissuade them from pursuing the purchase of the Building." For example, Wong called the CEO of at least two developers and threatened to block any sale of the Building—a power defendants did not have at the time, as they lacked a 25% interest in the Building.

¶ 10    In exerting pressure on third parties, defendants allegedly lied about two things. First, "as early as November 2017," defendants told several real estate companies that they owned 25% of the Building when, in fact, they only owned about 18%. And second, defendants allegedly made false statements about the Association's ownership of the "air rights" above the building, claiming that the "air rights" belonged to the commercial owner on the ground floor and not to

the Building owners. That was significant, says the Association, because without "air rights," a prospective buyer of the Building would not be able to convert the Building from a low-rise to a high-rise. To combat that allegedly false statement, the Association hired a surveyor, who concluded that the "air rights" were owned by the Association and commercial property owners in proportion to their ownership of the entire property.

¶ 11    In early January 2018, one of the defendants, Ryan O'Neill, sent a letter to all unit owners explaining defendants' "plan." According to this letter, defendants' goal was "to improve the units we have purchased and gradually convert them to rentals." Their "long term" strategy was to continue buying up units and convert the whole property into a "luxury rental building."

¶ 12    After this letter was sent, on January 17, 2018, the Association's board held a meeting and passed a resolution to begin the process of selling the Building. This resolution authorized a real estate company to list the property for sale. According to the Association, it "reasonably expected that there would be significant interest in the Building from developers and that the sale of the Building could close relatively quickly."

¶ 13    But defendants, according to the complaint, had other plans. After the decision to sell was authorized, defendants "stepped up their scare tactics campaign and continued to make false and misleading statements to accomplish their purpose." During the January 17 board meeting, defendants claimed that they owned over 25% of the units and threatened that they would block any offers the Association received on the Building. In fact, the complaint alleges, defendants still only owned about 18% of the units.

¶ 14    Through January and February, defendants continued to contact unit owners and insist that they had a blocking 25% ownership in the Building. In February, the Association's lawyer responded by sending a letter to the unit owners that defendants "only owned an estimated

17.72% interest in the Units." At the same time, to thwart defendants from purchasing more units, the Association adopted new rules governing the leasing of units. In April 2018, in a different lawsuit, defendants challenged those rule changes as "arbitrary and capricious."

¶ 15 That same month, April 2018, the Association's real estate agent issued a press release announcing that the Building was for sale. The day after that announcement, an article appeared in the Crain's Chicago Business periodical, which quoted an attorney for defendant MCZ Development as claiming that the attempt to sell was futile: "They [the Association] might as well throw in the Brooklyn Bridge and the Sears Tower." Ultimately, the lawyer concluded, "[the Association] can't deliver those and they can't deliver this Building."

¶ 16 According to the complaint, this article was published after defendants contacted a reporter for Crain's. The Association alleges that this Crain's article was published for the specific purpose of thwarting potential buyers from pursuing their interest in the Building and reducing the overall market value of the property.

¶ 17 In June 2018, defendants stated that they would only offer $47 million for the Building. According to the Association, that offer was "tens of millions below the market value." In conjunction with this statement, a lawyer for defendants sent a letter to the other unit owners, stating that they "owned and controlled more than 25% of the Units" and would not be supporting the Association's current efforts to sell to anyone other than defendants. They once again threatened that unit prices would continue to drop as they purchased more units. At the time of this June 2018 letter, defendants did not own 25% or greater of the Building and could not block a sale on their own. Defendants again repeated these claims in a July 2018 letter.

¶ 18 In September 2018, however, defendants *did* obtain unit ownership "barely exceeding the 25% threshold of total Units." The Association claims that, but for defendants' "false and

misleading statements," it would have received a fair offer to purchase *before* defendants obtained their blocking percentage. Specifically, the complaint lists nine companies with interest in the building that allegedly decided to " 'pass' specifically because of concerns about Defendants' activities and involvement in the Building." Of these companies, five toured the building as part of "their due diligence and all indicated a strong interest in purchasing the Building." One toured the building with "its equity/financing partner, which indicated it was further along in the due diligence process." All five companies withdrew from the process after learning of defendants' "purported stranglehold on the Building."

¶ 19    In November 2018, the Association received an offer to purchase the Building for $68 million. At a November 28, 2018 meeting to discuss the offer, defendants (who now had enough ownership interest to block the sale) indicated that they would vote no and "stated unconditionally and unequivocally that the Building is not for sale." Left with "no options," the board authorized filing the present suit against defendants in December 2018.

¶ 20    In April 2019, the Association opened the $68 million offer to a vote of the unit owners. Defendants, who at the time owned approximately 27% of the Building, voted no. The overall vote was approximately 59% to 41% in favor of the sale, well below the required 75% for approval. In June 2019, the Association received a $72 million offer to purchase the Building. Defendants voted no on that offer as well, and it failed to obtain the requisite approval.

¶ 21    The Association's original 2018 complaint, filed in chancery, only made claims against Lerner, MCZ Development, the 540 Lake Shore defendants, and Chicago Title Land Trust Company. The original complaint alleged several claims, including tortious interference with prospective economic advantage and conspiracy claims relevant to this appeal. The original defendants moved to dismiss, arguing lack of standing and insufficient damages, among other

things. The court originally dismissed the complaint, but, upon reconsideration, allowed the Association to amend its complaint.

¶ 22    While that case was pending, in April 2020, the Association filed a *separate* complaint—this one in the law division—against the original defendants that alleged defamation, slander of title, and conspiracy. These two cases were then consolidated in the law division. In March 2021, the existing defendants moved to dismiss, reiterating their previous arguments regarding standing and damages. The court, after briefing and argument, dismissed the claims from the law division case with prejudice but allowed the tortious interference (and the corresponding conspiracy claim) to go forward.

¶ 23    During discovery on these remaining counts, the Association claims to have learned of the other defendants' involvement in the scheme to undervalue the Building. As such, in January 2022, the court allowed the Association to file a second amended complaint that added new defendants—Thaddeus Wong, Michael Golden, and a few more companies—to the pending tortious interference and conspiracy claims. The new defendants moved to dismiss, and the court allowed the Association to file a third amended complaint, which consolidated the claims against *all* defendants.

¶ 24    Relevant here, the third amended complaint alleged claims for tortious interference with business expectancy (count 2), conspiracy to commit tortious interference (count 3), defamation (count 5), slander of title (count 6), conspiracy to defame (count 7), and violations of the Real Estate License Act of 2000 (License Act) (225 ILCS 454/1-1 *et seq.* (West 2018)) (count 8).

¶ 25    The new defendants moved to dismiss and, like the original defendants, argued lack of standing and insufficient damages. The court, the third judge to preside over the case, dismissed the case "against all Defendants"—despite only the new defendants moving for dismissal.

¶ 26    The Court's order is brief but gives some indication of the bases for dismissal. The License Act claim (count 8) was dismissed because "the Act contains no private right of action." The claims for defamation (count 5), slander of title (count 6), and conspiracy (counts 3 and 7) were dismissed "for the same reasons the Court (prior judges) previously dismissed these counts." And the tortious interference claim (count 2) was dismissed because the Association "failed to properly allege sufficient direct and unjustified interference directed at a party with whom [it] had a reasonable expectancy of business relationship."

¶ 27    This timely appeal followed.

¶ 28                                    ANALYSIS

¶ 29    This appeal concerns a dismissal under section 2-619.1 of the Code of Civil Procedure, which combines motions brought under sections 2-615 and 2-619. See 735 ILCS 5/2-619.1 (West 2022); *id*. §§ 2-615, 2-619. A section 2-615 motion attacks a complaint on its face, whereas a section 2-619 motion raises " 'other affirmative matter.' " *Patrick Engineering*, 2012 IL 113148, ¶ 31 (quoting 735 ILCS 5/2-619(a)(9) (West 2010)). We are required to accept all well-pleaded allegations as true but will not accept conclusions unsupported by facts. *Id.* We review dismissals under section 2-619.1 *de novo*. *Id.* We may affirm on any basis in the record, regardless of whether it was the circuit court's reason. *Eberhardt v. Village of Tinley Park*, 2024 IL App (1st) 230139, ¶ 20.

¶ 30                                 I. Jurisdiction

¶ 31    Before reaching the merits, we address defendants' challenge to appellate jurisdiction over part of this appeal.

¶ 32    Defendants argue that we lack jurisdiction to review the dismissal of the claims first raised in the law division case—the defamation, slander of title, and corresponding conspiracy

claims. Despite the law division case being consolidated with the original chancery action, defendants claim that they retained their separate identities and, thus, the Association was required to appeal the dismissal of those claims when they were first dismissed—back in 2021. See *Kassnel v. Village of Rosemont*, 135 Ill. App. 3d 361, 364-65 (1985) (consolidated cases that retain separate identity must be appealed separately). That argument might hold water for certain consolidation orders, but not the one entered here.

¶ 33    Consolidations come in many forms. The court might consolidate cases for the purpose of discovery only, in which case the cases retain a separate identity and case numbers for all non-discovery purposes. See *Ellis v. AAR Parts Trading, Inc.*, 357 Ill. App. 3d 723, 731 (2005). It might consolidate cases solely for the purpose of a "hearing on certain common issues," in which case, again, these cases retain separate case numbers and receive separate judgments. See *Kassnel*, 135 Ill. App. 3d at 364. Or the court may consolidate cases for trial, yet they retain their separate dockets, verdicts, and judgments. See *In re Adoption of S.G.*, 401 Ill. App. 3d 775, 781 (2010). In each of these circumstances, an order dismissing one of the actions is final and appealable, and the clock to appeal starts when *that* case is dismissed in a final judgment. *Id.*

¶ 34    The other type of consolidation—frankly, the more common one—is when the actions are simply merged into one. *Id.* This happens when "several actions are pending which might have been brought as a single action," and the court combines them to resolve the issues in a single suit. *Busch v. Mison*, 385 Ill. App. 3d 620, 624 (2008). In this context, each case loses its individual identity, and, absent a Rule 304(a) finding, the final judgments of dismissal are not appealable until *all* issues have been resolved in the consolidated case. *S.G.*, 401 Ill. App. 3d at 781; see Ill. S. Ct. R. 304(a) (eff. Mar. 8, 2016).

¶ 35    That latter, more common type of consolidation occurred here. The court's consolidation order left no doubt that it "consolidate[d] case 20 L 4330 into case 18 CH 15814 *for all purposes*" (emphasis added) and, if it were not clear enough that the law division case no longer existed as a separate action, the order further provided that "all future dates in case 20 L 4330 are stricken." There is no merit to the argument that the claims originally filed within the law division case should be treated as part of a separate action requiring a separate appeal. Our jurisdiction is proper. We now move to the merits.

¶ 36                                    II. Tortious Interference

¶ 37    We start with count 2, tortious interference with business expectancy—technically what we recognize as "intentional interference with prospective economic advantage." *Anderson v. Vanden Dorpel*, 172 Ill. 2d 399, 406 (1996). To plead that claim, a plaintiff must allege (1) a reasonable expectation of entering into a valid business relationship, (2) the defendant's knowledge of that expectation, (3) the defendant's purposeful interference that prevents the expectancy from ripening into a valid business relationship, and (4) damages caused by the defendant's interference. *Atanus v. American Airlines, Inc.*, 403 Ill. App. 3d 549, 554 (2010). Many claims, as here, fail on the first element, a reasonable expectancy.

¶ 38    To be actionable, an expectation must be sufficiently concrete; it must rise above a hope of consummating a business relationship. For example, in *Anderson*, 172 Ill. 2d at 403-04, the plaintiff claimed the defendant defamed her, costing her a job opportunity. She alleged that, prior to the defamation, she was the " 'leading candidate,' " as she had passed the first round of interviews with favorable comments. *Id.* at 408. Even taking as true (at the dismissal stage) that the plaintiff was in a favorable position, our supreme court concluded that she did not have a valid expectancy, as the allegations "demonstrate[d] nothing more than that the plaintiff was a

candidate for a position with the YMCA and that she was scheduled for further interviews at the time her candidacy came to an end. The hope of receiving a job offer is not a sufficient expectancy." *Id.* at 407-08. The court added that allowing recovery to job candidates "would considerably broaden the scope of the tort." *Id.* at 411.

¶ 39    Contrast that fact pattern with *Malatesta v. Leichter*, 186 Ill. App. 3d 602 (1989), where the plaintiff planned to purchase a Chevrolet dealership and got as far as entering into a buy-sell agreement with the current owner. All that remained was obtaining final approval from General Motors to transfer ownership. But the defendant made negative comments to General Motors that led to General Motors rejecting the transfer. We found the plaintiff's expectation sufficiently concrete, as he was the only person with a buy-sell agreement with the current owner and was only one step away from owning that franchise. *Id.* at 617-18.

¶ 40    In the context of real estate, this court has held that the potential of buying a home does not ripen into an actionable expectation when, as is usually the case, the seller is free to accept arms-length offers from any buyer it chooses. See *Stefani v. Baird & Warner, Inc.*, 157 Ill. App. 3d 167, 175-76 (1987). There, the plaintiffs hired an agent with Baird & Warner (B&W) to represent them in their search for a new home. *Id.* at 169. In February 1984, they made an offer on a home and continued negotiations with that owner, exchanging counteroffers, into April. But on April 19, another prospective buyer, also using B&W as their agent, swooped in and offered a higher purchase price, which the homeowner accepted. *Id.* at 169-70. We rejected the plaintiffs' claim of an actionable expectation. We noted that the seller "had listed the property for sale with a multiple listing service and could accept any offer from any potential buyer up to the time of consummation of a sale of the property." *Id.* at 175-76.

¶ 41    So even when a potential sale is more than a hope, even when it has advanced to serious, good-faith negotiations, as long as either side is free to walk away for whatever reason, courts have been reluctant to enforce an expectation that the parties will ultimately consummate the relationship. And for good reason. Potential business relationships fall apart for any number of reasons—cold feet, a change in economic circumstances, a better offer from someone else, the list goes on—and the law should be loath to inject commitments into those relationships that the parties have not yet made themselves. Someone asked for a reference about a job candidate should not fear legal action if she has something negative to say about that candidate to the prospective employer. See *Anderson*, 172 Ill. 2d at 411. Someone who was outbid on a home should not be able to sue the realtor who represented the winning bidder. See *Stefani*, 157 Ill. App. 3d at 175-76.

¶ 42    It should not be surprising, then, that we agree that the circuit court properly dismissed this count for lack of an actionable expectation. We take as true the Association's allegations that the Building was prime, exceptionally valuable real estate. And there is a fair, perhaps even strong possibility that the Association could have sold the Building before September 2018, when defendants gathered a sufficient ownership interest to block a sale.

¶ 43    But the expectation of a sale was too remote, for two interrelated reasons. For one, it was far from a certainty that someone would have even bid on the property before September 2018, much less that it would have been a competitive, market-value (or above market-value) bid. The complaint alleges that several parties "passed" on bidding, but even had they bid, there is no certainty what that bid would have been. Even if the would-be bidders gave favorable comments about the property and their potential bid, as the complaint alleges, we are reminded of our supreme court's discussion of the favorable comments the job applicant received from her initial

interviews in *Anderson*, 172 Ill. 2d at 408, when the court quoted the trial judge's wry

observation that " '[g]enerally people don't tell you that interviews went badly.' "

¶ 44    Which dovetails into the second reason, that it is mere speculation that the Association

would have *accepted* an offer on the Building. An acceptance required the approval of 75% of

the unit owners. Even before September 2018, when defendants obtained over 25% of the

interest and thus a veto, it is by no means a guarantee that the remaining unit owners would have

accepted any particular offer that came in.

¶ 45    The Association, in its reply brief, argues that it "had a reasonable expectation to engage

in a sales process free of the falsehoods and deception cause[d] by Defendants." But as we noted

in *Stefani*, the vagaries of that "sales process"—offering a property for sale, soliciting any and all

bids—introduce a significant level of uncertainty as to whether offers will come, when they will

come, how much they will be, and whether the seller will accept them. Open questions, all of

them, and here the prospect of a sale was far less certain than in *Stefani*, which at least had

advanced to multiple counteroffers during two months of negotiations. Here, we never reached

the point of a bid. We recognize that this is the Association's point—that defendants scared off

the bidders—but that does not make the possibility of a sale any more concrete.

¶ 46    To be clear, we do *not* hold, as a bright-line rule, that no sale of real estate could ever be

the subject of a claim for tortious interference with prospective economic advantage. Every case

will present its unique facts. But the expectation here was not sufficiently concrete to rise to an

actionable one. The dismissal of count 2 was proper.

¶ 47    The Association claims that, even if count 2 should be dismissed as to the new defendants

who sought dismissal on this ground, the original defendants (from the pre-consolidation

chancery action) did not prevail on this argument, and thus, count 2 should not have been

dismissed as to them. In fact, the Association claims, the original defendants answered the complaint, thus forfeiting this legal objection. See *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 60 (1994) (generally speaking, defendant waives defects in pleading when answering complaint).

¶ 48    That is incorrect. First, the lack of an actionable expectation is not a mere defect in the pleadings; it is a substantive legal ruling that, as a matter of law, the Association cannot prevail on count 2. And more to the point, nothing stops a circuit judge from reconsidering an interlocutory order, even a final judgment, before it becomes appealable. See *In re Marriage of Carstens*, 2018 IL App (2d) 170183, ¶ 24; *Lake County Riverboat L.P. v. Illinois Gaming Board*, 313 Ill. App. 3d 943, 950 (2000) ("A trial judge may review, modify, or vacate an interlocutory order at any time before final judgment, even if the original order was entered by another trial judge ***."). So the dismissal of count 2 as to each and every defendant was proper. We uphold that judgment.

¶ 49                                  III. Defamation

¶ 50    We next turn to the defamation claim. Plaintiff must plead facts showing that the defendant made a false statement about the plaintiff, the defendant made an unprivileged publication of that statement to a third party, and the publication caused damages. *Solaia Technology, LLC v. Specialty Publication Co.*, 221 Ill. 2d 558, 579 (2006). Defendants attack virtually every prong of the defamation claim here—their statements were not false but rather were true, substantially true, or opinion; their statements were not about the Association *per se*; the statements have not been pleaded with the requisite particularity; and the Association cannot establish damages as a matter of law. We resolve this question on their final argument, damages, for reasons not materially different from our ruling above on the tortious-interference count.

¶ 51    Some false statements are deemed defamatory *per se* because they are obviously harmful

to the plaintiff's reputation. *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 87 (1996). They include false statements imputing such things as the plaintiff's commission of a crime or the plaintiff's lack of professional integrity or ability. See *Van Horne v. Muller*, 185 Ill. 2d 299, 307 (1998). If a statement falls into one of the recognized *per se* categories, a plaintiff need not demonstrate a causal link between the defamatory statement and resulting injury; damages are presumed. *Id.*; *Bryson*, 174 Ill. 2d at 87. So, for example, if a defendant falsely states that a teacher was intimate with a student in a hotel room, because that statement is defamatory *per se*, the teacher need not prove that she suffered actual damages. See *Dobias v. Oak Park & River Forest High School District 200*, 2016 IL App (1st) 152205, ¶ 69.

¶ 52    Here, the alleged defamation consists of two statements: (1) defendants lied about owning more than 25% of the units, thus allowing them to block a sale of the Building, and (2) they lied about whether the Association owned the "air rights" above the Building. The Association does not claim that either statement constitutes defamation *per se*. We agree.

¶ 53    If the alleged false statement is not defamatory *per se*, then the claim is for defamation *per quod*. *Hardiman v. Aslam*, 2019 IL App (1st) 173196, ¶ 5. The damages are by definition less apparent, and the law thus demands more of the plaintiff. To recover for defamation *per quod*, "the plaintiff must plead and prove that she sustained actual damage of a pecuniary nature ('special damages')." *Bryson*, 174 Ill. 2d at 87-88. And the damages must be grounded in specifics, not generic claims of harm. " '[I]t is well established that general allegations, such as damage to the plaintiff's reputation, health, economic loss and emotional distress, are insufficient to sustain such a cause of action.' " *Sarmont v. DeWitt*, 2024 IL App (2d) 230239, ¶ 29 (quoting *Tunca v. Painter*, 2012 IL App (1st) 093384, ¶ 60); see *Benton v. Little League Baseball, Inc.*, 2020 IL App (1st) 190549, ¶ 59 (same).

¶ 54    For example, it was not enough to allege that, as result of defamatory statements, it was "impossible for [the plaintiff] to find work in their professional field." *Rivera v. Allstate Insurance Co.*, 2021 IL App (1st) 200735, ¶ 51. The plaintiff needed to allege "specific facts to show that a prospective employer refused to hire them because of the alleged defamatory statements." *Id.* A plaintiff's allegations that potential customers "refused to deal with him" was insufficient, as the complaint did not allege that these customers told the plaintiff that the defamatory statements were the cause of that refusal, nor could plaintiff allege actual pecuniary loss. *Taradash v. Adelet/Scott-Fetzer Co.*, 260 Ill. App. 3d 313, 318 (1993).

¶ 55    A like result obtained in *Barry Harlem Corp. v. Kraff*, 273 Ill. App. 3d 388, 395 (1995), where the complaint alleged that defendant, a rival ophthalmologist, published defamatory commentary in his newsletter about the plaintiff's novel form of cataract surgery. The complaint alleged that, due to the defamatory commentary, the plaintiff " 'lost patients who would have otherwise presented themselves for treatment at [the plaintiff's clinic] but did not do so.' " *Id.* Those allegations were insufficient to establish special damages, as the complaint did not allege "that any patients advised [the plaintiff] that because of the statements in the commentary, they would not seek services from plaintiff," nor did the complaint allege that "any appointments were cancelled or that any patient who had consulted, but not yet made a decision, advised it that he or she would not proceed [with the plaintiff's services] because of the commentary." *Id.*

¶ 56    To its credit, the Association comes closer to pleading special damages than in these cases. The complaint here identifies five different companies that toured the Building and had the financial capability to make a competitive offer on the Building. The complaint further alleges that "[a]ll five companies indicated that their interest waned substantially upon learning of [defendants'] stranglehold on the Building" and that, "[o]n information and belief, all

potential purchasers considered Defendants' alleged ability to block the sale of Building, Defendants' inaccurate statements about the air rights and the Commercial portion being not part of the deal" as "major factors in deciding not to make an offer for the Building."

¶ 57    So in that sense, the complaint does not suffer from the same flaw as in *Rivera*, *Taradash*, or *Barry Harlem* and is more akin to cases where we found that the complaint properly pleaded special damages, as it identified specific examples where customers withdrew or opted not to pursue business with the plaintiff due to the defamatory statements. See, *e.g.*, *Tunca*, 2012 IL App (1st) 093384, ¶ 62 (plaintiff surgeon alleged that accusations of medical malpractice caused $861,506 decrease in income and 25% drop in referrals); *Becker v. Zellner*, 292 Ill. App. 3d 116, 127 (1997) (plaintiff alleged that third party stopped doing business with him due to defamatory statements); *Halpern v. News-Sun Broadcasting Co.*, 53 Ill. App. 3d 644, 653 (1977) (plaintiff nursing home alleged that patients left nursing home, and others withdrew applications, due to defamatory statements).

¶ 58    But in those cases, the plaintiffs could put an actual dollar value on the loss; they could prove the required "actual damage of a pecuniary nature." *Bryson*, 174 Ill. 2d at 87-88. The plaintiff lost an actual contract with someone or, at a minimum, people who had applied to live in a nursing home withdrew their applications. Those damages are capable of calculation. Indeed, in *Tunca*, 2012 IL App (1st) 093384, ¶ 63, we distinguished *Barry Harlem* and *Taradash*, among other reasons, because the complaints in those cases "did not specify any actual financial loss suffered as a result of losing prospective clients."

¶ 59    The problem here, unfortunately, is that the complaint does not plead, nor could the Association ever prove, "actual damage of a pecuniary nature" as required. *Bryson*, 174 Ill. 2d at 87-88. In this particular context, there are simply too many variables. The Association may able

to plead and prove that bidders were scared away as a result of the alleged defamatory statements, but they could never prove whether a bidder would have actually submitted an offer, when it would have done so (before September 2018, thus avoiding defendants' veto, or afterward), or the amount a bidder would have offered.

¶ 60 And just as critically, the Association could never prove that 75% of the unit owners would have accepted that bid, much less when they would have done so. This last point, alone, is crucial, as a purchase like this one could involve significant negotiations and be judged by more than dollar value alone. To use an easy hypothetical, what if one bidder offered $70 million but told the unit owners they had to move out, but another bidder offered $65 million while allowing the unit owners to stay in their units as rental tenants? Which bid would be considered "better?" Which, if either, would be acceptable? Each individual unit owner's priorities could differ.

¶ 61 The alleged damages here are far too speculative to warrant recovery for actual pecuniary harm as required for defamation *per quod*. The dismissal of this count was proper.

¶ 62                                IV. Slander of Title and Conspiracy

¶ 63 We need only briefly address the slander-of-title claim. Not surprisingly, slander of title is not materially different than defamation, "slander" itself being an old-fashioned term for (oral) defamation. See *id.* at 89. The plaintiff must plead " 'a false and malicious publication, oral or written, of words which disparage a person's title to property resulting in special damages.' " *Süd Family Ltd. Partnership v. Otto Baum Co.*, 2024 IL App (4th) 220782, ¶ 64 (quoting *Whildin v. Kovacs*, 82 Ill. App. 3d 1015, 1016 (1980)). We have already explained that the Association can neither plead nor prove special damages. So no claim for slander of title may lie, either, and we uphold the dismissal of that count.

¶ 64    Having affirmed the dismissal of the predicate tort claims, the civil-conspiracy claim resolves itself. A civil conspiracy requires an underlying tort in furtherance of the conspiracy. *Merrilees v. Merrilees*, 2013 IL App (1st) 121897, ¶ 49. If the " 'plaintiff fails to state an independent cause of action underlying [the] conspiracy allegations, the claim for conspiracy also fails.' " *Id.* (quoting *Indeck North American Power Fund, L.P. v. Norweb PLC*, 316 Ill. App. 3d 416, 432 (2000)). The Association acknowledges as much in its briefs. Absent an actionable underlying tort, the conspiracy claim fails. We uphold the dismissal of that count, too.

¶ 65                         V. Violations of License Act

¶ 66    Finally, we consider the dismissal of the count directed against only defendants Wong and Golden, alleging a violation of the License Act, the state law that regulates the licensing and conduct of real-estate brokers. See 225 ILCS 454/art. 1 (West 2018). A quick review of these particular defendants' alleged roles in this affair, relevant to this count, is in order.

¶ 67    Wong and Golden are the co-founders of @properties, a real estate brokerage firm, and were the primary owners of an LLC that bought a number of the individual units of the Building in what the Association describes as their quest to obtain 25% ownership of the Building to establish veto power. The complaint likewise alleges that Wong and Golden were two of the principal perpetrators of the alleged campaign of disinformation to the general public and, more specifically, to potential bidders, attempting to scare them off from bidding by their false statements about possessing a 25% ownership interest (before it was true) and the Building's lack of full "air rights" over the Building.

¶ 68    The complaint also alleges that, on information and belief, at all relevant times, Wong and Golden were licensed real estate brokers, a fact we must assume as true at this stage, and the only reason they could even potentially be liable under the License Act.

¶ 69    Though the complaint is rather imprecise in this regard, between the general allegations in the complaint and the plaintiff's arguments on appeal, we discern that the Association is claiming two different categories of violations of the License Act: (1) Wong's and Golden's false statements to potential bidders, to scare them off from bidding on the Building, and (2) their false statements to individual unit owners, to scare them into *selling* their units to the LLC owned by Wong and Golden.

¶ 70    The circuit court concluded that the License Act did not provide a private right of action. The Association says that was error, citing a provision of the License Act that, indeed, provides a private right of action for certain violations. For the reasons we explain below, while private causes of action are available under the License Act, they are not available here for either claimed violation, for very different reasons.

¶ 71    Section 15-5 of the License Act provides that "[t]his Article 15 may serve as a basis for private rights of action and defenses by sellers, buyers, landlords, tenants, managing brokers, and brokers." *Id.* § 15-5(c). The Association claims that Wong and Golden violated a provision within article 15, namely section 15-25, which provides that "[l]icensees shall treat all customers honestly and shall not negligently or knowingly give them false information." *Id.* § 15-25(a). A "customer" is anyone on the other side of the transaction from the broker (as opposed to the "client," whom the broker represents). See *id.* § 1-10 (" 'Customer' means a consumer who is not being represented by the licensee"; " 'Client' means a person who is being represented by a licensee.").

¶ 72    Again, there are two claimed violations of section 15-25. The first is that Wong and Golden lied to prospective buyers of the Building when they said they already owned 25% of the voting shares of the Building, giving them a veto over any sale, and when they lied about the

Building's ownership of air rights. The problem here is that neither Wong nor Golden were acting as brokers—as "licensees" under section 15-25—when they made those assertions.

¶ 73    A licensed "broker" under the License Act is defined by a long list of actions she may perform. See *id.* They include the following acts, for compensation: selling or buying real estate, negotiating the sale or purchase, listing a property for sale, collecting rent, or doing comparative analyses to help competitively price the property. *Id.* (And for what it's worth, the activities governed by this law—"licensed activities"—are defined simply by referring one back to the definition of "broker." See *id.*)

¶ 74    We need not parse every nook and cranny of this long "broker" definition, because the Association does not even try to claim that Wong and Golden were acting as its brokers on the sale of the Building. Quite the contrary: the complaint repeatedly alleges that the Association's broker for the sale of the Building was a company named CBRE. Nor does the complaint allege or so much as hint that Wong or Golden purported to *portray* themselves as the brokers. The notion would be laughable; two men who allegedly ran around telling bidders *not* to make an offer, that the Building was not for sale, that they would veto any attempt to sell it, could be accused of many things, but pretending to be brokering the sale would not be one of them.

¶ 75    Wong and Golden owned units in the Building (via their LLC). Perhaps it was clear to other bidders by then that they intended one day to buy the Building themselves, after removing all competition. But they were not engaged in licensed brokerage activities during their (alleged) campaign of sabotage of potential outside bidders. We are aware of no decision or provision in the License Act, nor has the Association offered any, that would permit a private right of action against someone who was not engaged in licensed brokerage activity at the relevant time, simply because they happen to have a broker license.

¶ 76    Insofar as this count is directed at Wong's and Golden's alleged lies to outside bidders about the purchase of the Building, the License Act provides no private right of action to the Association.

¶ 77    The second claimed violation of the License Act is that Wong and Golden, in their race to acquire 25% of the ownership interest, lied to individual unit owners—most notably claiming to already have gained a 25% interest before that fact was true—thus inducing unit owners to agree to sell their units to Wong's and Golden's LLC. Parroting again the language of section 15-25, the Association claims that Wong and Golden did not "treat [these] customers honestly" and "knowingly g[a]ve them false information." *Id.* § 15-25(a). We find, however, that the Association cannot assert this private cause of action, because it lacks standing to do so.

¶ 78    Defendants have raised a standing challenge to this entire lawsuit, each and every count. We have resisted addressing that question, as we may affirm on any basis in the record, and we find the standing question to be thornier than the bases on which we have relied to affirm. But this context is different. Unlike the other challenges, in which the Association asserted standing on behalf of all unit owners for alleged actions that diminished the property value of the Building, here the claim is specific to individual units. That is a meaningful distinction.

¶ 79    As noted above, article 15 of the License Act permits private causes of action by "sellers, buyers, landlords, tenants, managing brokers, and brokers" for violations of a provision within article 15 only. *Id.* § 15-5(c). No mention there of condo associations. In the context of the claimed violation here—that Wong and Golden lied to induce unit owners to sell their units—the individual unit owners would have a right to assert a private cause of action as the "seller" under section 15-5. See *id.* The Association, obviously, was not the "seller" of those units.

¶ 80    The Association acknowledges as much but claims it has standing to represent these individual unit owners under section 9.1(b) of the Condominium Property Act. See 765 ILCS 605/9.1(b) (West 2018). Section 9.1(b) provides that "[t]he board of managers shall have standing and capacity to act in a *representative capacity* in relation to matters involving the common elements or more than one unit, *on behalf of the unit owners*, as their interests may appear." (Emphases added.) *Id.*

¶ 81    The problem, unfortunately, is that the individual owners who sold their units are, obviously, *no longer unit owners*. They are no longer members of the Association; whoever bought their units has taken their spots in that membership. The Association has no more a right to "represent" a former unit owner under section 9.1(b) than it does to represent someone who never owned a unit in the first place. The Association lacks standing to assert this claim.

¶ 82    We affirm the dismissal of this count as well.

¶ 83                                    CONCLUSION

¶ 84    Having found no error in the dismissal of all counts, we must affirm the judgment in all respects. We are aware that defendants' behavior here, as alleged (and much of which is not denied by defendants), constitutes capitalism at its most Darwinian—conduct that, if true, could best be described as predatory and even cruel. But given the unique circumstances in which it played out, plaintiff is unable to identify any actionable tort or statutory violation. By this ruling, we do not mean to countenance defendants' behavior, only to apply the law as we find it.

¶ 85    The judgment of the circuit court is affirmed.

¶ 86    Affirmed.

*540 North Lake Shore Drive Condominium Ass'n v. MCZ Development Corp.*,
**2025 IL App (1st) 230733**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 18-CH-15814, 20-L-4330; the Hon. John Curry, Jr., Judge, presiding. |
| **Attorneys for Appellant:** | Daniel W. Tarpey and David G. Wix, of Tarpey Wix LLC, of Chicago, for appellant. |
| **Attorneys for Appellee:** | William Choslovsky, Ari Rosenthal, and Daniel Sechuga, of Ginsberg Jacobs LLC, of Chicago, for appellees. |