2026 IL App (2d) 250303
No. 2-25-0303
Order filed June 2, 2026

**NOTICE:** This order was filed under Illinois Supreme Court Rule 23(b) and is not precedential except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

HARRIS N.A., Plaintiff,

v.

CHICAGO TITLE LAND TRUST COMPANY, as successor trustee under trust agreement dated July 6, 2004, and known as Trust No. 133035, EXCLUSIVE LAND DEVELOPMENT, INC., CLASSIC HOME DESIGNS, INC., HONEYBEE LAND INVESTMENT, LLC, TALLGRASS SUBDIVISION HOMEOWNERS ASSOCIATION, MICHAEL J. GRAFT, JR., WILLIAM C. GRAFT, SR., UNKNOWN OWNERS, UNKNOWN TENANTS, and NON-RECORD CLAIMANTS, Defendants.

(William C. Graft, Sr., Cross-Plaintiff, Third-Party Plaintiff-Appellant v. Michael J. Graft, Jr., Cross-Defendant-Appellee).

Appeal from the Circuit Court of Lake County.
Honorable Janelle K. Christensen, Judge, Presiding.
No. 09-CH-4358

JUSTICE BIRKETT delivered the judgment of the court.
Justices McLaren and Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Trial court's finding that cross-defendant's breach of fiduciary duty did not proximately cause cross-plaintiff's damages was not against the manifest weight of the evidence, and cross-plaintiff forfeited any arguments that the trial court abused its discretion in denying him leave to file an amended complaint.

¶ 2    Cross-plaintiff and third-party plaintiff, William C. Graft, appeals the trial court's judgment finding that cross-defendant, Michael J. Graft, did not proximately cause him injury by breaching

his fiduciary duties. Additionally, William argues that the trial court erred in denying him leave to file a third amended complaint. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4    Starting in 2001, brothers William and Michael sought to utilize their combined experience as a real estate attorney and a home builder, respectively, to develop real estate parcels together. In 2004, William learned of an opportunity to develop 110 acres of farmland in Barrington and contacted Michael concerning the same. They agreed to purchase and develop the property into a gated development named Tallgrass. William began acquiring parcels of the land, and the two incorporated companies to complete the project: Honeybee Land Investments, LLC (Honeybee), and Exclusive Land Development for Tallgrass, LLC (Exclusive). The brothers, who co-owned the companies, intended for Honeybee to finance and hold title to the Barrington property, while Exclusive was intended to finance any required infrastructure.

¶ 5    On October 3, 2005, Harris Bank provided Michael's own company, Michael J. Graft Builder Inc. (Builder), with a $4 million loan (Builder loan) with a maturity date of October 3, 2006.

¶ 6    On June 15, 2006, Harris Bank provided Exclusive with an $8,030,000 loan (Exclusive loan) to finance Tallgrass's infrastructure. As part of the loan agreement, Exclusive was required to pay down the principal balance with $4,500,000 of proceeds from the first 10 sold lots, meaning $450,000 from each lot was required to go to Harris. Honeybee received a $7,730,000 loan (Honeybee loan) from the bank as well. The Exclusive and Honeybee loans were both set to mature on June 15, 2009.

¶ 7    Eventually, utilizing the Honeybee loan, the brothers purchased all 110 acres of the property and obtained a plat of subdivision dividing it into 71 lots. William had earlier created a

trust that now held title to the combined property. The brothers developed a marketing plan for the individual lots while continuing to build the surrounding infrastructure using funds from the Exclusive loan. In 2006, they began selling lots with prices ranging between $450,000 and $630,000. The brothers directly applied all proceeds of the sales to the Exclusive loan's principal balance.

¶ 8      In September 2007, Michael phoned William, telling him that "he was in shock because he had just gotten a call from his banker at Harris Bank," who told him that Builder was "more or less out of credit." Michael had not previously informed him of any credit issues Builder was experiencing.

¶ 9      Later, on January 1, 2008, the brothers each executed individual "Contribution of Membership Interest Agreement[s]" in which they attested that, "due to the current economic environment, the net value of Honeybee's underlying asset is zero." At this time, Honeybee's only asset was a beneficial interest in the Tallgrass property. Due to the housing market crash, the brothers faced continued difficulties in selling lots. By October 1, 2009, they had only sold 7 of the 71 lots.

¶ 10     In February 2008, while the brothers continued marketing the Tallgrass lots, Michael informed William that "his [Builder loan was] assigned to a workout group with Harris Bank." On October 31, 2008, Harris informed Michael that the Builder loan was in default. Michael did not include William in any of the ensuing conversations that he had with Stephen Somner, a Harris Bank loan officer, concerning the matter. In December 2008, Harris began partially denying requests by Michael to draw from Builder's credit.

¶ 11    On March 4, 2009, Halquist Stone Company, Inc., a Wisconsin corporation on which William is a board member, offered to purchase the Honeybee, Exclusive, and Builder loans for $6,450,000.

¶ 12    By June 15, 2009, the Honeybee and Exclusive loans matured with an outstanding debt of $13,551,532.04. On June 30, 2009, William reached out to Somner to ensure that Builder's finances would not impact the Tallgrass project, informing him that the interest reserves for the Tallgrass loans would compensate Harris for any low sales. He also suggested that Halquist remained interested in purchasing the brothers' loans otherwise. On October 1, 2009, Harris filed a foreclosure action against Michael and William for the balance of the loans under case No. 09-CH-4358. While pursuing certain counterclaims against Harris, William continued his efforts to resolve their loans through alternative financing.

¶ 13    On June 10, 2011, William filed his first cross-complaint against Michael, alleging various breaches of fiduciary duty. On January 19, 2012, Michael—through another of his companies, MJG Construction LLC, filed a complaint for legal malpractice against William and his law firm in Cook County under case No. 12-L-693.

¶ 14    On September 14, 2012, Michael entered into a confidential agreement with Harris Bank, requiring him to "use all reasonable efforts" to convince William to enter a consent foreclosure over the Tallgrass property. In exchange, Harris would obtain a foreclosure judgment against Michael and Builder while forgiving $6,900,000 of Michael's own debt. On January 15, 2014, William became aware of Michael's agreement with Harris Bank.

¶ 15    Eventually, on August 24, 2014, the foreclosure court granted summary judgment in favor of Harris, noting that Michael, who was a guarantor on Exclusive's promissory note with Harris,

was in default for Builder's loan agreement, thereby triggering various cross-default provisions in the brothers' remaining loan agreements.

¶ 16    On August 19, 2014, William filed a two-count complaint against Michael in Lake County, raising additional claims of breaches of fiduciary duty.

¶ 17    On February 27, 2015, the foreclosure court entered its judgment of foreclosure and possession by consent. The case, however, remained active.

¶ 18    On March 23, 2015, William filed his second amended complaint in his remaining Lake County case, alleging that Michael breached certain fiduciary duties owed to him pertaining to the Tallgrass project and an unrelated Florida project. On April 23, 2015, Michael filed a motion to dismiss the second amended complaint, arguing that the parties were required to litigate the dispute in Cook County or through arbitration. Additionally, he contended that William failed to show the existence of any fiduciary relationship. On December 9, 2015, the matter was transferred to Cook County, where it would be consolidated with Michael's 2012 malpractice case under case No. 15-CH-18486. On July 12, 2016, the Cook County court granted Michael's motion to dismiss without prejudice, giving William leave to file a third amended complaint by August 9, 2016. Two years later, on August 9, 2018, William filed his motion for leave to file a third amended complaint. On January 10, 2019, the court denied his motion.

¶ 19    On April 5, 2019, William filed his combined second amended crossclaim and third-party complaint with the foreclosure court. Count I of the second amended crossclaim was a derivative action alleging that Michael had breached certain fiduciary duties owed to Exclusive and Honeybee by concealing Builder's default, entering into the secret Harris agreement, and violating a provision of Exclusive's loan agreement pertaining to the sales of individual lots. Count II alleged that Michael's breaches also caused injury to William individually. On May 7, 2019, Michael

moved to dismiss count II of the second amended crossclaim for failure to state a claim. On August 13, 2019, the court granted the motion as to count II.

¶ 20    On November 2, 2021, case No. 15-CH-18486 was transferred back to Lake County and consolidated with case No. 12-L-693 under what would become case No. 22-CH-64. On February 24, 2022, the Lake County court entered an order consolidating case No. 22-CH-64 with the initial foreclosure action, effectively consolidating all the parties' ongoing litigation under case No. 09-CH-4358. On October 21, 2024, the court held trial on the surviving count of William's second amended crossclaim. During opening arguments, William asserted that, had Michael not breached his fiduciary duties by entering into the secret Harris agreement, the brothers could have refinanced their loans or obtained a bridge lender in September 2012 to salvage their project.

¶ 21    Michael MaRous, a real estate appraiser and consultant, testified that he visited the Tallgrass site several times to retroactively appraise the unsold lots and determine their values as of September 30, 2012, assuming they were conveyed in fee simple. According to MaRous, the overall value of the remaining 62 lots for that time was $28,950,000. To reach this amount, MaRous multiplied the value of each of the unsold lots according to their originally assigned value, then deducted $500,000 to cover remaining infrastructure costs. He also evaluated "existing sales in the subject development" alongside other "individual lot sales in the area." Of the 11 other sales, however, 10 were located in Cook County, while the Tallgrass development is located in Lake County. Still, MaRous opined that, if the lots were sold as part of a bulk sale, they could have reasonably been expected to fetch $20,000,000.

¶ 22    On cross-examination, MaRous acknowledged that he had not performed any title searches for any lots prior to valuing them. He recognized that, as a result of the earlier foreclosure proceedings, Harris had an "encumbrance on all of [the lots]" which would have "generally"

affected their marketability. Nonetheless, for purposes of his appraisal, he assumed the lots would be sold in "fee simple free[,] of encumbrances."

¶ 23    Steven Holowicki, an equity and debt consultant for commercial real estate, testified that he sources loans to clients seeking commercial real estate financing.  Assuming that a bridge lender would help salvage the Tallgrass loans before the remaining lots were sold for the values described in MaRous' appraisal, Holowicki projected that the brothers would have realized $5,822,083 in profits from the project. To reach this number, Holowicki assumed that the brothers would sell approximately 16 lots each year. On cross-examination, however, Holowicki acknowledged that, despite MaRous' estimate, the brothers sold only nine lots by September 30, 2012. Further, he recognized that the brothers never sold more than one home in any given month.

¶ 24    Because, in his experience, lenders were eager to accept discounted payoffs to eliminate "bad loans" from their books, Holowicki also prepared a second projection that assumed a 40% loan discount. Under this second projection, the brothers would have profited $13,872,435 from the Tallgrass project. Neither of Holowicki's projections factored in the foreclosure proceedings ensnaring the development as of September 30, 2012.

¶ 25    George Gelis testified that he was the principal of Surge Financial Group, an entity that restructures real estate debt. Following the 2008 market collapse, banks sought Gelis' assistance to consolidate or refinance underwater loans. At the time, banks commonly bundled and sold such loans at a "deep discount" to hard money bridge lenders, who were eager to purchase any loans involving "risk-averse projects." These lower risk projects often involved properties that had already been developed and only needed to be marketed and sold.

¶ 26    Relying on the MaRous report and Holowicki's projections, Gelis opined that a hard money lender would "definitely" have refinanced the Tallgrass loan as of September 30, 2012, if given

the opportunity. He noted that the project was "risk[-]averse," the market was recovering, and the brothers had already sold some lots, proving the project's viability. Further, the brothers had already spent two years building up the surrounding infrastructure and had begun marketing the project, which had been made "a victim to *** the collapse of the real estate market in [2008]." Gelis was unaware whether anyone had contacted any hard money lenders to restructure the Tallgrass project's outstanding debts.

¶ 27    On June 18, 2025, the court issued its judgment, finding that Michael breached fiduciary duties owed to Honeybee and Exclusive by failing to notify William of Builder's default, entering into the secret agreement with Harris Bank, and selling an individual lot for less than the brothers' agreed-upon price point. However, the court found that MaRous' appraisal of the property as it existed in 2012—which formed the cornerstone of Holowicki's and Gelis' opinions—was not supported by the evidence. For instance, his appraisal assumed that the individual lots' values, as assigned by the brothers in 2006, when the market was at its height, would remain constant through 2012. Further, when pressed about the presence of any comparable properties supporting his valuation, MaRous failed to identify any sales in Lake County, where Tallgrass was located, and he failed to appreciate the negative effects the parties' ongoing litigation had on the property, which was reflected by the brothers' low sales.

¶ 28    Given the fact that Holowicki's and Gelis' testimonies relied upon the figures provided by MaRous, the court also reasoned that their opinions as to lost profits lacked weight. Moreover, while Holowicki and Gelis had credibly testified about banks' general inclinations to jettison defaulted loans at discounted rates, neither expert had offered any specific evidence that Harris Bank was willing to negotiate its lien or entertain a short sale. In fact, the record revealed that Harris Bank conversely had declined the Halquist offer on two separate occasions without

negotiation, and its secret agreement with Michael to broker a consent foreclosure evinced an unwillingness to compromise. For these reasons, the court found that Michael's breaches were not the proximate cause of Honeybee's or Exclusive's injuries, which the entities had failed to establish with a fair degree of certainty.

¶ 29    William timely appeals.

¶ 30                                II. ANALYSIS

¶ 31    On appeal, William argues that the trial court's findings concerning the proximate cause and reasonable certainty of the Tallgrass entities' injuries are against the manifest weight of the evidence, and that the Cook County court erred in denying William leave to file his third amended complaint.

¶ 32                            A. Proximate Cause

¶ 33    First, because the record contains no evidence of a potential deal with any hard money lender, the trial court's determination that Michael did not proximately cause his injuries was not against the manifest weight of the evidence. To sustain a claim for breach of fiduciary duty, a party must prove: (1) a fiduciary duty; (2) a breach of that duty; and (3) damages proximately caused thereby. *D'Attomo v. Baumbeck*, 2015 IL App (2d) 140865, ¶ 64.

> "The term 'proximate cause' describes two distinct requirements: cause in fact and legal cause, which is a policy decision that limits how far a defendant's legal responsibility should be extended for conduct that, in fact, caused the harm. [Citation.] Cause in fact can only be established when there is a reasonable certainty that a defendant's acts caused the injury or damage. [Citation.] Using the substantial factor test, a defendant's conduct is a factual cause of the plaintiff's injury if the conduct was a material element and a substantial factor in bringing about the injury. [Citation.] A defendant's acts are a legal cause only if

- 9 -

they are so closely tied to the plaintiff's injury that [the defendant] should be held legally responsible for it. [Citation.] Legal cause is essentially a question of foreseeability: a negligent act is a proximate cause of an injury if the injury is of a type which a reasonable [person] would see as a likely result of [their] conduct." *In re Commonwealth Edison Company Illinois Consumer Fraud Litigation*, 2023 IL App (1st) 220105, ¶ 23.

"Questions regarding breach of a duty and proximate cause of the injury are issues of fact, reserved for the trier of fact to decide." *Cooke v. Maxum Sports Bar & Grill, Ltd.* 2018 IL App (2d) 170249, ¶ 53 (citing *Krywin v. Chicago Transit Authority*, 238 Ill. 2d 215, 226 (2010)). We will not reverse the trial court's factual findings unless they are against the manifest weight of the evidence. *Id.* (citing *Eychaner v. Gross*, 202 Ill. 2d 228, 251 (2002)). "A decision is against the manifest weight of the evidence only when the opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Id.*

¶ 34    Here, William argues that the trial court misunderstood his theory of proximate cause when it found that Michael's agreement with Harris Bank did not cause the Tallgrass entities' injuries— namely, their inability to secure alternative financing and ultimately realize profits. According to William, he never argued that the secret agreement precluded any attempts to refinance the loans. Rather, his theory was that Michael's betrayal undermined the brothers' ability to obtain a bridge loan to satisfy the loans in full, which, in light of the "unrebutted evidence" of banks' eagerness to dispose of hemorrhaging loans following the market collapse, would have otherwise been available. Given this misunderstanding, William contends that the court improperly relied on the Halquist rejections and the secret agreement as evidence of Harris' unwillingness to refinance. Instead, William concludes that the evidence showing banks' general practice to sell troublesome loans proved proximate cause. We disagree.

¶ 35    Even accepting William's framing of his earlier argument, he overlooks the fact that Holowicki's and Gelis' "unrebutted" testimonies concerning the availability of a prospective bridge lender were based on the figures provided by MaRous, which, as the trial court noted, were fraught with deficiencies. First, in determining the lots' values, MaRous simply adopted the brothers' 2006 valuations—set at the market's height—rather than deriving their September 2012 valuations by evaluating comparable properties. In fact, MaRous did not analyze any comparable sales at all in compiling his estimates. Instead, he mainly referenced Cook County properties that were seemingly unencumbered by foreclosure or other legal proceedings for comparison to the Tallgrass development.

¶ 36    Portions of his analysis also relied on the brothers' purported capabilities to sell lots at an ahistorical rate, despite the fact that the brothers had only sold seven lots by the time their loans matured, and they had never sold more than one lot in any given month. Thus, while Holowicki's and Gelis' testimonies might suggest that a bridge lender would have been willing to finance higher-selling Cook County developments held in fee simple, William presented no competent evidence that lenders would have financed this project, which was located in a different county, had weak historical sales, and was entangled in what can accurately be described as scorched-earth litigation.

¶ 37    William tries to avoid the various pitfalls presented by MaRous' testimony by reminding us that the remaining experts relied not on his testimony, but on his report. While the report was not admitted into evidence, William maintains that the applicable rules of evidence permitted Holowicki and Gelis to rely upon it in forming their opinions. William conflates admissibility with credibility. Here, the trial court did not find Gelis' or Holowicki's testimony to be inadmissible. Rather, the court found that their credibility was undermined by their reliance on the MaRous

report which, as shown by his testimony, was unreliable. For these reasons, the trial court's findings as to proximate cause were not against the manifest weight of the evidence. Furthermore, because William has failed to establish proximate cause, an essential element of his claim, we need not consider the ancillary issue of whether he proved his damages with reasonable certainty. See *D'Attomo*, 2015 IL App (2d) 140865, ¶ 64.

¶ 38                                 B. Third Amended Complaint

¶ 39    We turn next to William's arguments concerning the Cook County court's denial of leave to file his third amended complaint. As a preliminary question, however, we must briefly address our jurisdiction over this final matter, which Michael calls into question. Appellate courts have an independent duty to verify our jurisdiction and will dismiss an appeal where it is lacking. *In re Marriage of Knoerr*, 377 Ill. App. 3d 1042, 1043 (2007).

¶ 40    Michael argues that we lack jurisdiction over the January 10, 2019, order denying William leave because, on March 23, 2022, the parties agreed to voluntarily dismiss the matter as part of case No. 22-CH-64's consolidation with case No. 09-CH-4358. Thus, according to Michael, because William did not appeal within 30 days of the March 23, 2022, voluntary dismissal, his notice of appeal was untimely as to the matter.

¶ 41    We disagree. Where separate actions are consolidated into a single suit, "each case loses its individual identity, and, absent a Rule 304(a) finding, the final judgments of dismissal are not appealable until *all* issues have been resolved in the consolidated case." *540 North Lake Shore Drive Condominium Association v. MCZ Development Corporation*, 2025 IL App (1st) 230733, ¶ 34. Because all the issues in this contested matter were not resolved until June 18, 2025, William's July 17, 2025, timely notice of appeal preserved our review of the pertinent January 2019 order.

¶ 42 Nonetheless, William has forfeited any argument that the Cook County court abused its discretion when denying him leave to file the third amended complaint. Section 2-616(a) of the Code of Civil Procedure (735 ILCS 5/2-616(a) (West 2018)) permits parties to liberally amend their pleadings, but that right is not unlimited. *Walker v. Shults Auto Sales, Inc.*, 2025 IL App (2d) 240459, ¶ 39. In *Loyola Academy v. S&S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 273 (1992), our supreme court articulated four factors courts must consider when ruling on motions to amend: (1) whether the amendment cures a defect in the pleading; (2) any resulting undue prejudice or surprise; (3) the moving party's timeliness; and (4) whether the moving party could have previously amended the pleading. We will not reverse a trial court's decision denying a motion to amend absent an abuse of discretion. *Insurance Benefit Group, Inc. v. Guarantee Trust Life Insurance Co.,* 2017 IL App (1st) 162808, ¶ 50. "An abuse of discretion occurs only when no reasonable person would take the view that the trial court adopted." *Walker*, 2025 IL App (2d) 240459, ¶ 41 (citing *Lacey v. Perrin*, 2015 IL App (2d) 141114, ¶ 76).

¶ 43 Pursuant to Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020), any argument appearing in an appellant's brief must "contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on."

> "An issue that is merely listed or included in a vague allegation of error is not 'argued' and will not satisfy the requirements of the rule. [Citations.] Moreover, an argument that is developed beyond mere list or vague allegation may be insufficient if it does not include citations to authority." *Vancura v. Katris*, 238 Ill. 2d 352, 369-70 (2010).

¶ 44 Here, William argues that an application of the *Loyola* factors "clear[ly]" reveals that the Cook County court abused its discretion in denying him leave to file a third amended complaint in case No. 22-CH-64. Concerning the first factor, William contends that his proposed amendment

"cured a deficiency in the [s]econd [a]mended [c]omplaint by removing MJG and Builder as defendants relating to the Florida property." As to the second factor, William asserts that his proposed amendment would "not surprise any party," as it included arguments initially iterated in a prior version of the complaint. Turning to the third factor, William argues that his amendment was timely "because [it] was sought while the case was still in the pleading stage." William claims that the final *Loyola* factor "is met as there is significant evidence that William attempted, although unsuccessfully, to amend the complaint to 'sustain the claim for which it was intended to be brought.'" (quoting 735 ILCS 5/2-616(a)).

¶ 45    Because William has failed to adequately develop his arguments, they are forfeited. While he argues that the proposed third amended complaint would have cured a defect in the earlier complaint relating to "the Florida property," his brief contains only a passing reference to that property without identifying any flaw in the second amended complaint. William's contentions as to the timeliness factor are similarly underdeveloped, as he offers no explanation for the 700-day delay in filing his third amended complaint. William's argument as to the fourth factor is largely unintelligible, and, in any event, he does not discuss the "significant evidence" he references in support of the amendment. For these reasons, William has failed to develop his arguments that the Cook County court abused its discretion by denying him leave to file the third amended complaint, and his contentions are forfeited.

¶ 46                                III. CONCLUSION

¶ 47    For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 48    Affirmed.